## VAN WAGENBERG *v.* VAN WAGENBERG

[No. 99, September Term, 1965.]

156

*Decided January 12, 1966.*

*Motion for rehearing filed February 11, 1966, denied March 2, 1966.*

The cause was argued before HAMMOND, HORNEY, OPPEN-HEIMER, BARNES and McWILLIAMS, JJ.

*Raymond S. Smethurst, Jr.,* with whom were *E. Dale Adkins, Jr.* and *Adkins & Potts* on the brief, for appellant.

*Thomas S. Simpkins,* with whom were *Simpkins & Simpkins* on the brief, for appellee.

OPPENHEIMER, J., delivered the opinion of the Court.

This appeal from a judgment entered in the Circuit Court for Somerset County on a judgment previously entered by the Supreme Court for New York County, New York, involves questions under the full faith and credit and due process of law clauses of the federal constitution and the construction of a New York statute. No testimony is involved; the facts before us are those disclosed by the pleadings and court records and are undisputed.

Andre Van Wagenberg, the appellant, (the husband) and Aino Van Wagenberg, the appellee, (the wife) were married in Washington, D. C. on May 24, 1943. Their only child, Maria Theresa, (the daughter) was born on August 5, 1946. The fam-

ily lived in Somerset County until marital difficulties arose, when the wife moved to Nassau County, New York, taking the daughter with her. There, the wife instituted an action for separation.

On April 25, 1952, the husband and wife entered into an agreement (the agreement) executed in the office of a law firm in New York City. The agreement gave the husband's residence as Princess Anne, Maryland, and that of the wife as Long Island, New York. It recited the marriage and separation of the parties and the institution of the wife's action for separation. It provided that the wife should have exclusive custody of the daughter and that the daughter's residence was to be with her mother. The husband agreed to pay $325 a month for the wife's support and maintenance, unless the parties were divorced and the wife remarried, and $175 for the support and maintenance of the daughter, until her attainment of majority, marriage or death.

Paragraph SECOND (d) reads as follows: "In addition to the sums hereinabove specified, the Husband shall pay all extraordinary and unusual medical expenses of the child arising from serious accidents or serious illnesses." To secure these payments, Paragraph FOURTH of the agreement required the husband to maintain on deposit with Fahnestock & Co., a New York investment brokerage house, $2000 in cash or marketable securities and to authorize Fahnestock & Co. to pay the wife her monthly allotment out of such funds upon presentment by her of a sworn statement that such allotment was at least fifteen days overdue. In the event of a withdrawal from the account by the wife, or a decline in the market value of any deposited securities below the stipulated $2000 figure, the husband was to make additional contributions sufficient to restore the fund to the full amount provided for.

The agreement provided that it was not to be merged in any order or decree in any divorce proceeding, although its provisions might be incorporated in any such order or decree, but was to continue in full force and effect between the parties.

Prior to the execution of the agreement, and evidently while the wife's proceeding for separation was pending in New York, the husband had instituted a divorce proceeding against the wife

in Somerset County, Maryland. After the agreement had been signed in New York, the wife filed a cross-bill in the Maryland proceeding. On June 2, 1952, the Circuit Court for Somerset County dismissed the husband's bill and granted the wife a divorce *a vinculo*. The court, in its decree, provided for the support and maintenance of the wife and daughter in the terms set forth in the agreement.

In August, 1954, the daughter contracted infantile paralysis. In April, 1963, the wife filed a complaint against the husband in the Supreme Court of the State of New York, County of New York. In her complaint, the wife alleged she was a resident of the City and State of New York and that the husband was a resident of Princess Anne, Maryland. She recited the terms of the agreement and the Maryland divorce decree, copies of both of which were filed as exhibits. The complaint alleged that, because of the daughter's infantile paralysis, it was necessary that she have four operations and special nursing care, and that the extraordinary medical expenses incurred by the wife on behalf of the daughter totalled $25,000 to date, of which the husband had paid only $6,500. The wife asked judgment for the remainder of the expenses, in the sum of $18,500.

Pursuant to Sections 302(a) (1) and 313 of the New York Civil Practice Law and Rules, a copy of the complaint was served upon the husband in Princess Anne on September 13, 1963, by a Maryland attorney. The husband filed no answer and entered no appearance of any kind in the New York case, either in person or by attorney. On November 19, 1963, the case was tried in the New York court before Justice Streit, without a jury, and judgment rendered for the wife for $18,500 plus interest and costs. The judgment recites that the action is for breach of an express contract, that the husband is a non-resident of New York, and that the summons and complaint were served on him personally without the State. It also recites that "a warrant of attachment granted in the action has been levied on the property" of the husband.

The wife filed suit on the New York judgment in the Circuit Court for Somerset County on December 26, 1963, and moved for summary judgment. The husband filed an affidavit in opposition to the wife's motion in which he set forth that he

had not been personally served with process in the New York proceeding in the State of New York, and claimed that the New York judgment is invalid as a judgment *in personam* and is not entitled to full faith and credit in Maryland. After further procedural pleadings, not here relevant, Judge Prettyman granted the wife's motion for summary judgment, and the husband appealed.

The husband contends first, that he has the right to contest the validity of the New York judgment, despite the full faith and credit clause; second, that the New York Legislature in enacting Section 302(a) (1) of the New York Civil Practice Law and Rules did not intend to include the execution of a separation agreement within the meaning of the jurisdictional phrase "transact any business"; and, third, that if the New York Civil Practice Law be construed contrary to this contention, then the assertion of jurisdiction over him by the New York court was unconstitutional as a deprivation of due process of law.

I

Under the full faith and credit clause of Article IV, § 1 of the federal constitution, and the act of Congress, 28 U. S. C. § 1738, the duly attested record of the judgment of a state is entitled to such faith and credit in every court within the United States as it has by law or usage in the state from which it is taken, and if it appears on its face, as here, to be a record of a court of general jurisdiction, its jurisdiction over the cause and the parties is presumed. *Adam v. Saenger,* 303 U. S. 59, 62 (1938) and cases therein cited; *Roach v. Jurchak,* 182 Md. 646, 650, 35 A. 2d 817 (1944). However, in a suit upon the judgment of another state the jurisdiction of the court which rendered it is open to judicial inquiry; if there was no jurisdiction, the judgment is not entitled to faith and credit. *Adam v. Saenger, supra,* at 62; *Thompson v. Whitman,* 85 U. S. (18 Wall.) 457, 469 (1874); *Johnson v. Johnson,* 199 Md. 329, 335, 86 A. 2d 520 (1952); Restatement, *Judgments,* § 5 and comment d (1942); Goodrich, *Conflict of Laws,* §§ 72 and 209 (4th ed. 1964); Rashid, *The Full Faith and Credit Clause: Collateral Attack on Jurisdictional Issues,* 36 Geo. L. J. 154 (1948).

If the court of the state rendering the judgment sued upon was not authorized by that state to exercise its jurisdiction in the particular matter, the purported judgment is subject to collateral attack. The power of the state (Maryland) in which the suit on the judgment of the sister state (New York) is brought, to examine into whether, under the New York law, the court of that state which rendered the judgment had authority to do so, is beyond question. *Treinies v. Sunshine Mining Co.,* 308 U. S. 66, 78 (1939); *Magdanz v. District Court of Woodbury County,* 222 Iowa 456, 269 N. W. 498 (1936); *Ellis Chalmers Mfg. Co. v. Lewelling Grain Co.,* 141 Kan. 350, 41 P. 2d 1032 (1935); *Traders Trust Co. v. Davidson,* 146 Minn. 224, 178 N. W. 735 (1920); *Folger v. Columbian Ins. Co. & Trustees,* 99 Mass. 267 (1868). "[T]he fact that a state has judicial jurisdiction to do a certain thing does not mean that any court of that state has power to do it * * * the fact that the court acted beyond the authority vested in it by the state may make the judgment void where rendered and therefore not entitled to recognition and enforcement elsewhere." Restatement (Second), *Conflict of Laws,* § 74, comment g, (Tent. Draft No. 3, 1956). See also *Goodrich, supra,* § 79 and 3 Freeman, *Judgments,* §§ 1370, 1389 (1925).

The husband is not barred from collaterally attacking the validity of the New York judgment by the doctrine of *res judicata.* He filed no answer and made no appearance of any kind in the New York proceedings. *Sutton v. Leib,* 342 U. S. 402, 408-09 (1952). Compare *Sherrer v. Sherrer,* 334 U. S. 343, 351 (1948) and *Chicot County Drainage Dist. v. Baxter State Bank,* 308 U. S. 371, 375 (1940). Compare, also, *Colby v. Colby,* 217 Md. 35, 141 A. 2d 506 (1958) and *Leatherbury v. Leatherbury,* 233 Md. 344, 196 A. 2d 883 (1964).

Not only did the husband not appear in any way in the New York proceedings, but the determination as to the jurisdiction of the New York court depended upon questions of law—the construction and constitutionality of the statute of the state under which the court acted. Those issues were not litigated. See Restatement, *Judgments,* § 10 comment b.

We hold that the judgment of the New York court is open to collateral attack by the husband in the Maryland action on that judgment.

## II

The New York statute involved is § 302 of the New York Civil Practice Law and Rules (the statute) effective September 1, 1963. It reads as follows:

"§ 302. *Personal jurisdiction by acts of non-domiciliaries*

(a) *Acts which are the basis of jurisdiction.*

A court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, as to a cause of action arising from any of the acts enumerated in this section, in the same manner as if he were a domiciliary of the state, if, in person or through an agent, he:

1. transacts any business within the state; or
2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or
3. owns, uses or possesses any real property situated within the state.

(b) *Effect of appearance.*

Where personal jurisdiction is based solely upon this section, an appearance does not confer such jurisdiction with respect to causes of action not arising from an act enumerated in this section."

The question before us is whether the term in (a) 1. "transacts any business within the state" applies to the execution by the husband of the agreement in New York, under the attendant circumstances. The husband contends that the jurisdictional phrase should be construed as limited to activities which are essentially "commercial" in the sense of endeavoring to make a financial profit and as excluding marital separation agreements.

As Justice Gray remarked in *Folger, supra,* "We cannot speak with the same confidence of the intention and the policy of the legislature of another state as we might of those of our own." Unlike the federal courts, we cannot refer the question of law to the state where it originated. See *Aldrich v. Aldrich,* 375 U. S. 249 (1963) and annots. 94 L. ed. 879 (1949) and 3 L. ed. 2d 1827 (1959).

We have the benefit, however, of three recent decisions of the New York Court of Appeals construing the relevant portion of the statute, although none of these decisions involved a question such as that before us. All three dealt with the applicability of the statute to foreign corporations. The three decisions are reported together as *Longines-Wittnauer Watch Co. v. Barnes & Reinecke,* 15 N. Y. 2d 443, 209 N. E. 2d 68, 261 N. Y. S. 2d 8 (1965). The first case, *Longines,* was an action by a New York corporation against a Delaware company, with its place of business in Illinois; the court found that the defendant had engaged in "purposeful acts" in New York sufficient to meet "the liberal statutory criterion." (at 457). In *Feathers v. Mc-Lucas,* the plaintiffs had brought a tort action for injuries sustained as a result of the explosion in New York of a tank manufactured by the foreign corporation in Kansas; the court held that the language of paragraph 2, conferring personal jurisdiction over a non-domiciliary which, in person or through an agent, commits a tortious act within the state, did not include the commission of a tortious act without the state which causes injury within it. Judge Fuld, who delivered the three opinions, pointed out that the New York statute was modeled upon a similar Illinois statute, and that, in a corresponding situation, the Illinois court, in *Gray v. American Radiator & Sanitary Corp.,* 22 Ill. 2d 432, 176 N. E. 2d 761 (1961), had held the tort was committed in Illinois for the purposes of the jurisdictional statute. The New York court, however, disagreed with the Illinois court's interpretation. The third case was *Singer v. Walker, cert. denied* 34 U. S. L. Week 3160 (U. S. Nov. 8, 1965), which also involved an alleged tort of a foreign corporation. There, a child, a resident of New York, had been injured, in Connecticut, by a hammer manufactured in Illinois by an Illinois corporation, and sold by a dealer in New York to the child's aunt. The court held that jurisdiction could not be sustained under paragraph 2, but that there was jurisdiction under paragraph 1 on the ground that the appellant had transacted business within New York and the cause of action was one "arising" therefrom.

It is the analysis of the genesis and purpose of the statute in Judge Fuld's opinion which we find particularly enlighten-

ing in the consideration of the problem before us. He pointed out that:

> "The standard for assessing the irreducible minimum forum activities constitutionally requisite to subject foreign corporations and nonresident individuals to personal jurisdiction was reformulated in the cases of *International Shoe Co. v. Washington* (326 U. S. 310) and *McGee v. International Life Ins. Co.* (355 U. S. 220). By those decisions, the Supreme Court opened a broad and previously unavailable—although still largely undefined—area for state exercise of jurisdiction over such parties. In place of the former rigid tests of 'residence' and 'doing business', the Supreme Court, in *International Shoe,* substituted the flexible requirement that a nonresident defendant, against whom a judgment in personam is sought in the forum state, be shown merely to 'have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice"' (326 U. S., at p. 316)." 15 N. Y. 2d at 451.

He quoted from *Hanson v. Denckla,* 357 U. S. 235, 253 (1958), that "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protection of its laws." (at 451-52).

Judge Fuld traced the history of the enactment of the statute as follows:

> "In enacting section 302, the Legislature chose not to fix precise guidelines, as other states have done, so as to draw within the jursidictional reach of the New York courts *only* contracts 'made within this State' (Md. Ann. Code, art. 23, § 92, subd. [d]) or contracts 'made in this State or to be performed in this State' (N. C. Gen. Stat., § 55-145, subd. [a], par. [1]) or contracts 'to be performed in whole or in part by either party in [this State]' (Minn. Stat. Ann., § 303.13, subd. 1, par. [3]; Tex. Rev. Civ. Stat. Ann.

[Vernon], art. 2031b, § 4; Vt. Stat. Ann., tit. 12, § 855). The Advisory Committee which drafted the section took cognizance of such statutes in its report (N. Y. Advisory Comm. Rep. [N. Y. Legis. Doc., 1958, No. 13], pp. 39-40) and decided, instead, to follow the broad, inclusive language of the Illinois provision, adopting as the criterion the 'transact[ion of] *any* business within the state.' The design of the legislation, as expressed by the committee, was to take advantage of the 'new [jurisdictional] enclave' (*Bomze v. Nardis Sportswear*, 165 F. 2d 33, 36, per L. HAND, J.) opened up by *International Shoe* where the nonresident defendant has engaged in some purposeful activity in this State in connection with the matter in suit. (See N. Y. Advisory Comm. Rep. [N. Y. Legis. Doc., 1958, No. 13], pp. 39-40; see, also, 1 Weinstein-Korn-Miller, N. Y. Civ. Prac., par. 302.06)." 15 N. Y. 2d 456-57.[1]

Again, at 460, the Judge said:

"* * * [T]he draftsmen of section 302 pointedly announced that their purpose was to confer on the court 'personal jurisdiction over a non-domiciliary *whose act*

---

1. In Gilliam v. Moog Industries, Inc., 239 Md. 107, 210 A. 2d 390 (1965), we referred to the enlargement of Maryland's jurisdiction over persons outside the state, effective June 1, 1964, Code 1957, (1965 Supp.) Art. 75, Secs. 94-100. Sec. 96(a) provides, in virtually the same language as the New York statute, that a court "may exercise personal jurisdiction over a person or corporation who acts, directly or by an agent, as to a cause of action arising from the person's: (1) transacting any business in this State * * *" Judge Hammond, for the Court, said, as to the new statute:

"It seems clear that the purpose of the Legislature in enacting these new provisions was to give the courts of the State personal jurisdiction over all out of state persons and corporations which constitutionally could be reached as having had sufficient Maryland contacts, under the jurisdictional yardstick established by the Supreme Court in cases such as International Shoe Co. v. Washington, 326 U. S. 310, 90 L. Ed. 95; McGee v. International Life Ins. Co., U. S. 220, 2 L. Ed. 2d 223; and Hanson v. Denckla, 357 U. S. 235, 2 L. Ed. 2d 1283." 239 Md. at 111.

*in the state* gives rise to a cause of action' or, stated somewhat differently, 'to subject non-residents to personal jurisdiction *when they commit acts within the state*'. (See N. Y. Advisory Comm. Rep. [N. Y. Legis. Doc., 1958, No. 13], pp. 37, 39; emphasis supplied.)"

We find it significant that, in applying "the plain language of the statute and the expressed design of those who drafted it" Judge Fuld repeatedly referred, not to commerce or transactions for profit, but to *acts* done within the state. He emphasized that the legislature had not confined the jurisdictional reach *only* to contracts made within the state, and that the design of the statute was to assert jurisdiction over any "purposeful activity" in the state. There is a strong inference, in his analysis, that the phrase "transaction of any business" includes, but is not limited to, contracts of any kind made within the state, and "purposeful activity" of any kind, within the state.

In discussing the facts in the three cases, the Judge necessarily referred to commercial transactions for these were the acts involved, but the analysis of the purpose, history and meaning of the statute which preceded the particularized consideration of the cases contains no such limitation. While in *Feathers* the New York court refused to go as far as had Illinois in the construction of the language of paragraph 2, the basis of the distinction was that it was the commission of an act within the state which was determinative. The consideration of the constitutional power of the legislature to include injuries resulting from tortious acts committed without the state is not relevant to the question involved in this section of our opinion, which concerns not constitutional power but legislative intent. As the New York court indicated, the failure of the New York legislature to include jurisdiction over the situation presented in *Feathers* was a matter of choice, not constitutional limitation. "[I]t could have made explicit provision for such situations as some states have done * * *" 15 N. Y. 2d at 461. But *Feathers* emphasizes that it is the commission or non-commission of an *act* within the state which governs.

That the execution of the agreement here involved was an act done within the state of New York is not in dispute. Not only was the agreement executed in the state but the covenants

requiring payments by the husband to the wife, for herself and the daughter, were to be fulfilled in that state. As security for the performance of the husband's obligations, a sum of money or securities were to be left in the state, in the custody of a New York investment brokerage house, and if the designated amount of the deposit was depleted, the husband obligated himself to make additional payments to the New York firm. These are business transactions. The New York suit resulted from the husband's alleged failure to make the additional payments to the wife, in New York, for which the agreement provided, to meet the extraordinary medical expenses of the daughter, who, the agreement further provided, was to be in the custody of the wife, a resident of New York. Clearly, the wife's cause of action arose from the act of the husband in executing the agreement and in failing to perform his obligations thereunder.

An agreement of the nature here involved is a legal act of the most serious nature. Unlike a marriage ceremony, which creates a status, or a divorce, which terminates a status, the agreement sounds in contract. The contract is specific and definite; by its express terms, it is not to be affected by any subsequent judicial action in divorce proceedings. The contractual nature of a separation agreement, as distinguished from the personal obligations inherent in the status of marriage, was recognized in England in the jurisdictional conflict between the ecclesiastic and civil courts.[2]

---

2. "From the canonical point of view marriage was a sacrament creating an indissoluble relation. The duties attaching to that relation were 'of the highest possible religious obligation' and paramount to the will of the parties. In ecclesiastical Courts an agreement or provision for a voluntary separation present or future was simply an agreement to commit a continuing breach of duties with which no secular authority could meddle, and therefore was illegal and void.

"For a long while all causes touching marriage even collaterally were claimed as within the exclusive jurisdiction of those Courts * * * But the common law, when once its jurisdiction in such matters was settled, never adopted the ecclesiastical theory to the full extent. A contract providing for and fixing the terms of an immediate separation is treated like any other legal contract * * * In Hunt v. Hunt [4 D. F. J. 221 (1861-62) ] the husband was restrained fom suing in the Divorce Court for restitution of conjugal

Judge Prettyman said in his opinion in the court below: "The Court has reached the decision, as stated in Black's Law Dictionary, that the word [business] has no specific or legal meaning, and that it is a very comprehensive term embracing everything about which a person may be engaged." It may well be that it is because "business" is not a word of art that the New York court used the term "act" so consistently in its discussion of the meaning of the statute.

The agreement on which the New York judgment was obtained, as above noted, employs terms and deals with matters commonly associated with business—the payment of money, in stated amounts, the provision for the payment of additional money in certain, expressly defined circumstances, and the creation and maintenance of an escrow fund. That the agreement was the result of negotiations between the husband and wife or their counsel is inherent in its nature; the contract was executed in a lawyer's office and is obviously drafted by attorneys. The inevitable preliminary negotiations, like the agreement itself, involved financial affairs. No profit was involved for any one, but, absent an express decision of the New York Court of Appeals to the contrary, we are reluctant to believe that the New York legislature, in enacting this statute, did not intend to protect its citizens as to the results of acts within the state which, however important in nature to the New York residents, did not involve a profit.

In *McGee v. International Life Ins. Co.,* 355 U. S. 220, 223 (1957) in holding constitutional a California statute which subjects foreign corporations to suit in California on insurance contracts with residents of that state even though the corporations

---

rights in violation of his covenant in a separation deed * * *" Pollock, Contracts, at 286-87 (13th Ed. 1950).

In Hunt v. Hunt, Lord Westbury said, at 238-39: "Such is the doctrine of the Ecclesiastical Courts, but the relative obligations of fulfilling the duties of a marriage contract, which are the basis of this ecclesiastical doctrine, the common law leaves to the conscience of the parties concerned. It regards a deed of separation as any other legal contract. If the covenant of the husband not to sue for restitution, which is a release of the right to compel cohabitation, be founded upon a valuable consideration, an action may be maintained upon it as upon any other legal covenant."

could not be served with process within its borders, the Supreme Court referred to California's manifest interest in providing effective means of redress for its residents. That case involved the due process clause rather than the interpretation of the statute, but it enunciates the purpose of a state in extending within constitutional limits its jurisdiction over non-residents. See also, *Compania de Astral v. Boston Metals Co.,* 205 Md. 237, 261-64, 107 A. 2d 357 (1954) *cert. denied* 348 U. S. 943 (1955) and authorities therein cited, and *Nelson v. Miller,* 11 Ill. 2d 378, 384, 143 N. E. 2d 673 (1957). New York has made abundantly clear its concern with the support of resident wives and children. Like most of the states, including Maryland, it has enacted a uniform support of dependents law (N. Y. Domestic Relations Law §§ 30-43), and in Penal Law § 480, makes a parent who abandons a child and wilfully omits to furnish necessary support guilty of a felony. The agreement here involved, executed in New York, provides for the support of wife and child in accordance with New York law. The State of New York, as well as the wife and daughter, has an interest in the husband's fulfillment of his agreement. To hold that this statute providing for jurisdiction over non-residents was not meant to include the husband on the facts here involved, because his contract was not a transaction in a commercial marketplace or did not look to the making of a profit, in our opinion, would be to ignore New York's manifest, particular interest in the subject matter of the transaction.

In their scholarly briefs and argument, counsel for the husband contend that the legislative history of the New York statute shows that the term "transacts any business" is only a legislative liberalization of the "doing business" test, and that the statute was not intended to extend the basic "doing business" test into non-commercial areas of activity. They cite the history of the "doing business" test in the decisions of the Supreme Court, and point to the fact that the common denominator of the cases sustaining jurisdiction, even in the enlarged concept of the later cases, was commercial. The difficulty with this argument is that while the subject matter of the Supreme Court decisions, which enlarged the concept of the extent to which a state could constitutionally make non-residents subject to its

jurisdiction, consisted of transactions entirely commercial in nature, there is nothing in these decisions which limits the broadened concept to such transactions. As *Longines* makes clear, the present test of whether a state can exercise jurisdiction over non-residents without violating due process is only that the non-resident defendant have such minimal contacts with the state that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." The test does not limit jurisdiction to contacts which have their roots in the market-place as opposed to contacts by acts within the state not actuated by the motive of profit. While the development of the criterion came about in cases in which corporations were involved, there is nothing in the letter or spirit of the standard which confines it to activities in which only business enterprises engage.

The term "transaction of any business" is generic and vague. As we have seen, the agreement in this case involves definite elements of a business nature. Paragraph 1 of the statute is not limited in terms to commercial transactions nor does it contain an exclusion of transactions not entered into for profit. Our study of the *Longines* decisions persuades us that it is the doing of an act—with the necessary contact in the state—which is determinative, and that the legislative history and the plain meaning of the statute show that it includes within its reach acts such as are here involved.

The husband's attorneys place strong reliance upon the case of *Willis v. Willis,* 42 Misc. 2d 473, 248 N. Y. S. 2d 260 (1964). That case was decided by the same court in which the wife in this case obtained her judgment in New York, after the judgment in issue in this case had been rendered. In *Willis,* the court decided, contrary to the prior decision of the same court (although not the same judge) that the execution of a separation agreement in New York between husband and wife did not constitute the transaction of business in the state within the meaning of the statute and that, in a suit by the wife to have the agreement set aside or enforced, service on the non-resident husband outside the state was invalid. *Willis* was decided before *Longines,* and, as in the New York suit of the wife in the present case, no appeal was taken.

The decision of a court not of last resort in other jurisdictions, while entitled to respect, is not determinative of the law of the state in which the decision is rendered. *Briggs and Co. v. District of Columbia,* 196 F. 2d 241, 243 (D.C.Cir. 1952) ; *Given v. Owen,* 73 Okl. 146, 175 P. 345 (1918). See also *United States v. Raynor,* 302 U. S. 540, 551-52 (1938).

The court in *Willis* gave three reasons for its decision. First, the opinion states that it does not appear to have been the intent of the draftsmen of the statute to expand the exercise of jurisdiction to the "outer limits of permissible jurisdiction" (at 474). However, that intent, as *Feathers* makes clear, only precludes the results of action taken out of the state as a basis for jurisdiction; it does not go to the construction of the statute as to what action taken within the state gives jurisdiction. As we have said, to us, the *Longines* decisions strongly indicate that it is the doing of an act within the state which is determinative. *Willis* cites the Second Preliminary Report of the Advisory Committee on Practice and Procedure (1958) in support of its conclusion, but that report states, at 39, that it is the intent of the proposed statute (later enacted) "to take advantage of the constitutional power of the state of New York to subject non-residents to personal jurisdiction when they commit *acts* within the state." (Emphasis supplied). Second, the *Willis* opinion states that its approach is governed by the general rule that, in the construction of statutes, approaches should be utilized which do not raise constitutional questions ; no decision is cited, and we have found none, that a construction of the statute as giving jurisdiction in the case here involved would raise any greater or different constitutional question than would be present if the statute, in terms, were restricted to acts which involve the making of money. Third, the court says that, in its opinion, "the intendment and contemplation of the verbiage" of the statute was in respect of transactions which have a commercial aspect. (at 475) We have previously indicated the reasons why we disagree with such a construction if it would exclude the transaction here involved. *Willis* was followed, without discussion, in *Durgom vs. Durgom,* 47 Misc. 2d 513, 262 N. Y. S. 2d 874 (1965).

The New York statute has also been construed in Massa-

chusetts, prior to *Longines,* in a situation similar to that before us, and the application of the statute to a non-resident husband who entered into a separation agreement with his wife in New York was upheld. *Spitz v. Spitz* (Mass. App. Dec.) (16 Legalite 278) (March, 1965) (The report of this case was evidently not available at the time of the argument in the present appeal.) In that case, the parties had been living in New York, but after the execution of the separation agreement, the husband came to Massachusetts where he was served with the summons in the New York action brought by the wife. Suit on the New York judgment obtained by the wife was brought in Massachusetts; the lower court refused the husband's plea in abatement and the Appellate Division affirmed. The court said:

> "Whether an arrangement whereby one lives apart from his wife and family and leaves the state of their residence can be designated 'doing business' is beside the point. The expression is not a term of art, and the reports of our highest courts reveal the great difficulty experienced in explaining it. See: *International Shoe Co. v. Washington,* 326 U. S. 310. What does matter is that a course of action inextricably involved in the status and legal responsibilities of the defendant is going on in the state of New York. The jurisdiction of the courts of New York over such a situation is by no means casual. The State of New York can, if it so desires, invoke criminal sanctions to enforce the claims of this plaintiff on the defendant. There is a strong social interest in the security of family life."

We hold that the husband's activities in New York brought him within the scope of the statute, if the statute, so construed, is constitutional.

### III

Whether the statute, as we have construed it, is constitutional depends on whether the entering of the judgment of the New York court against the husband, who was not served with process within that state's boundaries, violates his rights under the due process clause of the Fourteenth Amendment. *McGee v.*

*International Life Ins. Co., supra,* 355 U. S. at 222. As the New York court pointed out in *Longines,* at 458, the criteria in determining the validity of extraterritorial jurisdiction for claims relating to acts done within the state are whether the transaction upon which the suit is based had "substantial connection" within the state, *McGee,* at 223, whether the appellant's "contacts" within the state were such "that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice' " *International Shoe Co. v. Washington,* 326 U. S. 310, 316 (1945), and whether the appellant "purposefully avail[ed] itself of the privilege of conducting activities within * * * [the] state" and thereby "invok[ed] the benefits and protections of its laws." *Hanson v. Denckla,* 357 U. S. 235, 253 (1958). A comprehensive study of the development of these criteria is contained in *Developments in the Law — State-Court Jurisdiction,* 73 Harv. L. Rev. 909 (1960).

As to corporations, a single transaction within the state, given fulfillment of the other jurisdictional requisites, has been held sufficient to sustain the constitutionality of the service upon a foreign corporation, under the test of due process. *Astral, supra; The Dahlberg Co. v. Western Hearing Aid Center, Ltd.,* 259 Minn. 330, 107 N. W. (2d) 381, *cert. denied,* 366 U. S. 961 (1961). In *Longines-Wittnauer v. Barnes & Reinicke, supra,* in which jurisdiction over the foreign corporation was upheld, while a supplemental agreement was executed in New York, the contract on which the breach of warranty suit was based had been executed in Illinois.

The same rule, in general, applies to individuals. In *International Shoe Co.,* the Supreme Court said, at 319: "That clause [due process] does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties or relations." To support his conclusion that in order to subject a defendant to a judgment *in personam* if he be not present within the territory of the forum, due process requires only certain minimum contacts within it, Mr. Chief Justice Stone cited, *inter alia, Millikin v. Meyer,* 311 U. S. 457 (1940) and *Hess v. Pawloski,* 274 U. S. 352 (1927) in which the defendants were natural persons.

"[I]t would seem that the same considerations of fairness and the nature of the defendant's activity in the state which are utilized in determining jurisdiction over corporations should be equally applicable when the defendant is a natural person." *Calagaz v. Calhoon*, 309 F. 2d 248, 255 (5th Cir. 1962). See also Foster, *Personal Jurisdiction Based on Local Causes of Action,* 1956 Wis. L. Rev. 522 and 73 Harv. L. Rev., at 935-48.

In *Hess,* the Supreme Court held constitutional a Massachusetts statute subjecting non-residents to extraterritorial jurisdiction for disputes arising out of the operation of motor vehicles on the state's public highways, because of the state's power to regulate local acts dangerous to life and property. In *Henry L. Doherty & Co. v. Goodman,* 294 U. S. 623 (1935), the Court held constitutional an Iowa statute subjecting nonresident dealers in securities to the state's jurisdiction for claims related to local securities transactions, largely because of the state's strong interest in regulating businesses involving securities. In *Astral,* Chief Judge Brune, for the Court, said, 205 Md. at 258:

> "The non-resident motorist cases have shattered any argument to the effect that a single transaction by a non-resident may not be made the basis for amenability to suit in the state where the transaction occurred. The *Doherty & Co.* case has rendered untenable any contention that a contract made within a state cannot serve as the basis for suit in that state against a non-resident party to the contract."

He further said that, particularly in view of the later Supreme Court decisions, the fact these cases involved applications of the police power did not necessarily mean that service on a foreign corporation based upon a contract executed in Maryland was invalid. See also 73 Harv. L. Rev. at 947, and Reese & Galston, *Doing an Act or Causing Consequences as Bases of Judicial Jurisdiction,* 44 Iowa L. Rev. 249, 258-60 (1959).

The husband contends that, even though the execution of the agreement in New York may be held sufficient to give the New York court valid jurisdiction if the other constitutional requisites are present, the jurisdictional controls required in the case

of an individual are more substantial than in the case of a corporation. In support of this contention, he cites a dictum of Chief Judge Brune in *Astral*, at 262, that "in the case of foreign corporations a less rigorous standard may suffice than in the cases of individuals"; Reiblich, *Jurisdiction of Maryland Courts Over Foreign Corporations Under the Act of 1937*, 3 Md. L. Rev. 35, 71 (1938); and 73 Harv. L. Rev., at 936. We do not reach the question of whether the contacts and intent of a non-resident individual defendant in respect of the state in which judgment is rendered must be greater than those of a foreign corporation, for, in our opinion, assuming, *arguendo,* the correctness of the assumption, on the facts here involved, every criterion of jurisdiction is met.

It has been said that:

"Manifestly, when personal jurisdiction is asserted against a non-resident of the state solely on the ground that the action brought is related to a contract having substantial local contacts, those contacts are at a maximum where (1) both parties were present in the state when the contract was made; (2) the contract was to be performed wholly within the state; and (3) the facts constituting the breach took place within the state. But the examination to be made will also consider whether less than all the contracts just stated may suffice to sustain personal jurisdiction." 1956 Wis. L. Rev., at 565.

Here, both husband and wife were present in New York when the agreement was signed; the payments for which it provided were to be made to the wife in New York since the agreement stated she was a resident of that state; the escrow fund was deposited in New York and was to be maintained there; and the facts constituting the breach (failure of the husband to pay for the extraordinary medical expenses incurred on behalf of the daughter, also a resident of New York) took place in New York; it was in that state that the husband failed to support the daughter in accordance with the agreement.

There are additional substantial connections which the husband had in New York, before and at the time of the execu-

176

tion of the agreement. He was not domiciled in the state, but his wife and daughter lived there. He purposefully availed himself of the privilege of conducting activities within the state and invoked the benefits and protections of the New York laws when he agreed to make and did make the escrow deposit with the New York investment brokerage house for which the agreement called. Under New York law, dealers in securities are subject to regulation for the protection of the members of the public which do business with them. N. Y. General Business Law, §§ 352-359-h. In *Astral*, Chief Judge Brune, at 261-62, referred to the establishment of an escrow fund by the non-resident defendant as one of the factors which added up "to considerable contact with this State and considerable reliance upon its laws and the protection which they afforded."

New York has a manifest interest in the support and maintenance of its infant residents. As the Massachusetts court noted in *Spitz v. Spitz, supra,* criminal sanctions are available to effectuate the New York public policy.

The husband's "contacts" with New York were such that the maintenance of the New York suit did not offend traditional notions of fair play and substantial justice. The service of the husband outside of New York's territorial limits, did not, on the facts here involved, constitute an infringement of due process of law.

*Judgment affirmed; appellant to pay the costs.*