474 A.2d 1353

**Phyllis TATE**

v.

**BLUE CROSS OF WASHINGTON AND ALASKA.**

**No. 1269, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

May 14, 1984.

Susan M. Jenkins, Washington, D.C., with whom were Jenkins & Kurz, Washington, D.C., Lois R. Sacks and Fey, Wagner & Sacks, Rockville, on the brief, for appellant.

Anne G. Collins, Washington, D.C., with whom were Whiteford, Hart, Carmody & Wilson, P.C., and Charles J. Steele, Washington, D.C., on the brief, for appellee.

Argued before MOYLAN, LOWE and BELL, JJ.

MOYLAN, Judge.

The appellee is Blue Cross of Washington and Alaska (Blue Cross). The only question on this appeal is that of what business engaged in by Blue Cross or obligation undertaken by Blue Cross will bring it within the reach of Maryland's "long-arm" statute and subject it, therefore, to the *in personam* jurisdiction of the courts of this state.

Blue Cross is a nonprofit corporation organized under the laws of the State of Washington and qualified to do business in both Washington and Alaska. Its principal place of business is Seattle, Washington. It provides medical health benefits on behalf of its subscribers (and their covered dependents), who work or once worked in Washington or Alaska.

The appellant, Mrs. Phyllis Tate, is also a resident of Alaska. She was formerly married to Frank Ferguson, who was employed by the State of Alaska and was covered under a prepaid health benefit policy issued by Blue Cross. That policy covered, as a dependent, the daughter of Frank Ferguson and the appellant, Pamela Ferguson. Following her divorce from Mr. Ferguson, the appellant married John Haggitt, who was also an employee of the State of Alaska and was also covered under a prepaid health benefit policy

issued by Blue Cross. Pamela Ferguson, during the time she was the stepdaughter of John Haggitt, was also a covered dependent under his policy. As the result of a third marriage, the appellant is now Mrs. Tate.

In early 1978, Pamela was being treated for various psychiatric problems in Alaska, where both she and her mother then resided. One of the primary physicians recommended to Mrs. Tate that Pamela could benefit from treatment at Chestnut Lodge, a private psychiatric facility located in Rockville, Maryland. Mrs. Tate wrote to and received information about Chestnut Lodge, its facilities, and its care programs. She furnished information about Pamela to Chestnut Lodge. Chestnut Lodge responded that it would not consider accepting Pamela into the program unless both Pamela and her mother came to Maryland to discuss details with them. Mrs. Tate and Pamela made one trip to Maryland, but Pamela was not accepted by Chestnut Lodge for treatment at that time. Chestnut Lodge insisted, *inter alia,* that they receive confirmation that there was adequate medical insurance coverage for the bills that would be incurred.

Mrs. Tate wrote to Blue Cross at its main office in Seattle, Washington. She received on March 30, 1978, a written reply from Blue Cross indicating that Pamela was covered for in-patient psychiatric benefits under both Blue Cross policies, that of Pamela's father and that of Pamela's then stepfather. There is no dispute but that the policies covered appropriate in-patient care and treatment in other states as well as in Washington and Alaska. On April 27, 1978, Mrs. Tate succeeded in having Pamela admitted to Chestnut Lodge. Mrs. Tate signed an agreement with Chestnut Lodge contracting to pay for the professional care rendered. Pamela remained at Chestnut Lodge for the next several years. Initially, Blue Cross made payments to Chestnut Lodge directly under the policies.

No payments were made to Chestnut Lodge, however, after August 31, 1979, and on August 6, 1982, Chestnut

Lodge sued Mrs. Tate in the Circuit Court for Montgomery County for an unpaid balance of $37,834.29. Initially, Mrs. Tate sought unsuccessfully to challenge Maryland's exercise of personal jurisdiction over her. When that effort failed, she filed a third-party claim against Blue Cross.

Blue Cross filed a Motion Raising Preliminary Objection, alleging that Maryland did not have personal jurisdiction over it. After hearing oral argument on July 27, 1983, the hearing judge granted Blue Cross's motion and entered judgment in favor of it. This appeal has timely followed.

The pertinent statutory provisions are Courts and Judicial Proceedings Article, § 6–103(b):

"A court may exercise personal jurisdiction over a person, who directly or by an agent:

(1) Transacts any business or performs any character of work or service in the State;

(2) Contracts to supply ... services ... in the State;

. . . . .

(6) Contracts to insure or act as surety for, or on, any person ..., contract, obligation, or agreement located ... or to be performed within the State at the time the contract is made...."

Blue Cross has noted that it never at any time entered into a contract with Chestnut Lodge. That is quite true. Blue Cross has noted, moreover, that neither Pamela Ferguson, the twice-covered dependent, nor either of Frank Ferguson or John Haggitt, the Blue Cross policyholders, are parties to this suit. That is also quite true. All of these observations are, however, for immediate and present purposes, beside the point. We have not given any consideration to and intimate nothing with respect to the question of Mrs. Tate's standing to implead Blue Cross. It may be that Blue Cross has some other threshold defense in this regard, but that was not the issue before the court below, and it is not the issue before us. Our sole concern is with Blue Cross's contact with Maryland and not with the standing of the party who asserts that contact. The necessary narrow-

ing of focus in this regard was well explained by Judge Barnes for the Court of Appeals in *Groom v. Margulies*, 257 Md. 691, 703–704, 265 A.2d 249 (1970):

"In considering problems arising under the Long Arm Statute, it is important to distinguish between the *jurisdiction* of the forum state over the out-of-state defendant, on the one hand, and the *merits* of the case, on the other.... The contention [that contending that the defendant was not a proper party to the suit] is that the 'transaction of business' was not for Margulies individually but for a corporation, which Margulies contends was a disclosed principal. This contention, however, in our opinion is directed at the question of ultimate *liability* in the case. The statute makes the test of jurisdiction in the *present* circumstances, the transaction of *any* business without any qualification. Margulies did transact business in Maryland and Maryland has personal jurisdiction over him. His *defense* that *he is not liable* because he was acting for a disclosed corporate principal goes to the *merits* of the case, not to the *power* of the court to make the adjudication." (Emphasis in original).

*See also Feldman v. Magnetix Corporation*, 50 Md.App. 308, 310–312, 437 A.2d 895 (1981). Any possible challenge to standing is another question for another day. Our analysis will proceed, therefore, just as if the third-party plaintiff were Pamela Ferguson, Frank Ferguson, or John Haggitt rather than Phyllis Tate.

Although the application of Maryland's "long-arm" jurisdiction to a medical insurance carrier whose contact with Maryland consists of paying claims is one of first impression, the unmistakable trend and direction of the case law, state and federal, both focuses and controls the analysis that follows. Although earlier decisions may have foreshadowed the new approach, it was the Supreme Court's 1945 decision in *International Shoe Company v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, that gave birth to the modern era of *in personam* jurisdiction over nonresident corporations. Eschewing the earlier law that

the presence of a corporation (actual or constructive) in a state was a prerequisite to being subjected to that state's jurisdiction, the Supreme Court propounded its new formula of "minimum contacts," at 326 U.S. 316, at 66 S.Ct. 158:

"Historically the jurisdiction of courts to render judgment *in personam* is grounded on their de facto power over the defendant's person. Hence his presence within the territorial jurisdiction of a court was prerequisite to its rendition of a judgment personally binding him. *Pennoyer v. Neff*, 95 U.S. 714, 733 [24 L.Ed. 565]. But now that the *capias ad respondendum* has given way to personal service of summons or other form of notice, due process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' "

Subsequent Supreme Court decisions have reaffirmed the "minimum contacts" formulation as the standard by which to determine whether a state's exercise of jurisdiction over a nonresident defendant comports with the requirements of due process of law. *McGee v. International Life Insurance Company*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Keeton v. Hustler Magazine, Inc.*, —— U.S. ——, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984).

In the wake of the Supreme Court's 1945 decision expanding the constitutionally permissive exercise of personal jurisdiction by states, the National Conference of Commissioners on Uniform State Laws in August, 1962, promulgated the Uniform Interstate and International Procedure Act. This was approved by the House of Delegates of the American Bar Association in February, 1963. Maryland, in 1964, was among the first states to adopt the basic provisions of the new Uniform Act. 1964 Md.Laws, ch. 95. *See* Auerbach, *The "Long Arm" Comes to Maryland*, 26 Md.L.

Rev. 13 (1966). A thorough and scholarly analysis of the pre-1964 law in Maryland and the developments following the adoption of the Uniform Act was made by Judge Wilner for this Court in *Springle v. Cottrell Engineering Corp.,* 40 Md.App. 267, 391 A.2d 456 (1978).

The consistent trend of the Court of Appeals in interpreting the new Maryland "long-arm" statute has been to push it to the limits permitted by the Supreme Court's interpretation of the due process clause. In *Harris v. Arlen Properties,* 256 Md. 185, 195–196, 260 A.2d 22 (1969), Judge Finan spoke for the Court of Appeals:

> "In our own State the Legislature sought to provide a more flexible approach to jurisdiction by enacting our present 'Long Arm' Statute, Chapter 95 of the Acts of 1964. This Court recognized that there was a *purposeful effort* on the part of the Legislature *to broaden jurisdiction by expanding it to the boundaries of permissible constitutional limits.*" (Emphasis supplied).

In *Geelhoed v. Jensen,* 277 Md. 220, 224, 352 A.2d 818 (1976), Judge Levine reiterated that any exercise of personal jurisdiction that passes muster according to the due process clause will be compatible with the law of this state:

> "Application of the long arm statute is a two-step process. First, it must be determined whether the statute purports to authorize the assertion of personal jurisdiction. And secondly, it must be determined whether an exercise of jurisdiction permitted by the statute violates the Due Process Clause of the Fourteenth Amendment. It is important to note, however, that these determinations are interrelated. *As noted repeatedly in the cases, the long arm statute represents an effort by the Legislature to expand the boundaries of permissible in personam jurisdiction to the limits permitted by the Federal Constitution.*" (Emphasis supplied).

*See also Lamprecht v. Piper Aircraft Corporation,* 262 Md. 126, 130, 277 A.2d 272 (1971); *Gilliam v. Moog Industries,* 239 Md. 107, 111, 210 A.2d 390 (1965); *Krashes v.*

*White,* 275 Md. 549, 558–559, 341 A.2d 798 (1975); *Mohamed v. Michael,* 279 Md. 653, 657, 370 A.2d 551 (1977).

We have no difficulty in holding that Blue Cross had sufficient "minimum contact" with the State of Maryland as to permit Maryland to exercise "long-arm" jurisdiction over it without offending the due process clause. Blue Cross stresses that it had no office in Maryland, no resident agent in Maryland, no mailing address or telephone number in Maryland and solicited no subscribers in Maryland. It is true that these have been found to be relevant factors in many of the cases validating the exercise of "long-arm" jurisdiction. It is also true, however, that these are the typical factors looked to in the cases because most of the cases deal with the commercial sale of goods and services. Section 6–103(b)(1) speaks of the transaction of business rather than using the older and more restricted "doing business" test. In tracing this provision of the Uniform Act to its parent statute in Illinois, Professor Auerbach, *op. cit.,* discusses it, at 33:

> "This subdivision is derived from the statute of Illinois, and the courts of that state have contributed most to the interpretation of its language. The basic question which has arisen is what kind of activity amounts to the 'transaction of business.' It is clear that the intent of the statute is to require considerably less than what is required under the 'doing business' test."

In *Van Wagenberg v. Van Wagenberg,* 241 Md. 154, 170, 215 A.2d 812 (1966), *cert. den.* 385 U.S. 833, 87 S.Ct. 73, 17 L.Ed.2d 68 (1966), Judge Oppenheimer also analyzed the phrase "transacts any business":

> "The test does not limit jurisdiction to contacts which have their roots in the market-place as opposed to contacts by acts within the state not actuated by the motive of profit. While the development of the criterion came about in cases in which corporations were involved, there is nothing in the letter or spirit of the standard which confines it to activities in which only business enterprises engage.

The term 'transaction of any business' is generic and vague. As we have seen, the agreement in this case involves definite elements of a business nature. Paragraph 1 of the statute is not limited in terms to commercial transactions nor does it contain an exclusion of transactions not entered into for profit."

■ We are satisfied that Blue Cross transacted business in Maryland within the contemplation of § 6–103(b)(1). The insurance services were provided, to be sure, in the first instance to governmental employees of the States of Washington and Alaska. The benefits extended, however, to their dependents whether resident in those states or not. It is also undisputed that Blue Cross fully intended those covered under its policies to receive legitimate medical benefits for necessary medical services rendered outside Washington or Alaska. Blue Cross was fully apprised of the medical desirability of having Pamela Ferguson diagnosed, treated, and cared for in Maryland. Blue Cross, over an extended period of time, remitted payments under the policy to Chestnut Lodge in Maryland. In the last analysis, the "business" of Blue Cross was to collect premiums and to disburse benefits. It actively engaged in disbursing those benefits in Maryland.

We find especially persuasive in this regard the Supreme Court's 1957 decision of *McGee v. International Life Insurance Company, supra.* The defendant corporation there had its principal place of business in Texas. There, as here, it had no office or agent in the forum state of California. There, as here, it had engaged in a single contact with California. As the Supreme Court described the situation, at 355 U.S. 222, at 78 S.Ct. 200:

"It appears that neither Empire Mutual nor respondent has ever had any office or agent in California. And so far as the record before us shows, respondent has never solicited or done any insurance business in California apart from the policy involved here."

The Supreme Court held that that single contact was a sufficient connection with the forum state.

The contact here was, to be sure, "conducted by mail across state lines" and involved "parties separated by the full continent." It was just such considerations as these that the Supreme Court discussed, at 355 U.S. 222–223, at 78 S.Ct. 201:

> "Looking back over this long history of litigation a trend is clearly discernible toward expanding the permissible scope of state jurisdiction over foreign corporations and other nonresidents. In part this is attributable to the fundamental transformation of our national economy over the years. Today many commercial transactions touch two or more States and *may involve parties separated by the full continent.* With this increasing nationalization of commerce has come a great increase in the amount of *business conducted by mail across state lines.* At the same time modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity." (Emphasis supplied).

In speaking of the "substantial connection" between the defendant and the forum state, the Supreme Court described California's interest in the outcome of the suit, at 355 U.S. 223, at 78 S.Ct. 201:

> "It cannot be denied that California has a manifest interest in providing effective means of redress for its residents when their insurers refuse to pay claims. These residents would be at a severe disadvantage if they were forced to follow the insurance company to a distant State in order to hold it legally accountable."

In the present case, Maryland's "manifest interest" is in providing "effective means of redress for its residents" when the insurers of patients "refuse to pay claims" incurred by the patients after the. Maryland resident had received a guarantee that such insurance was available. A trial upon the merits would involve business records from

the Maryland institution and testimony from Maryland doctors who had been engaged in the diagnosis and treatment of Pamela Ferguson. Chestnut Lodge would, in the words of the Supreme Court, be placed "at a severe disadvantage if [it were] forced to follow the insurance company to a distant State in order to hold it legally accountable." Blue Cross, of course, counters with a claim that defending the case in Maryland would be inconvenient to it, but as the Supreme Court pointed out, at 355 U.S. 224, at 78 S.Ct. 201:

"Of course there may be inconvenience to the insurer if it is held amenable to suit in California where it had this contract but certainly nothing which amounts to a denial of due process."

■ Our holding does not rely on subsection 6–103(b)(1) alone but also finds support in subsections (2) and (6) as well. It is sufficient to sustain personal jurisdiction over a defendant, of course, if a plaintiff can show that the requirements of any one of the tests spelled out in the subsections have been met. *Lawson v. Baltimore Paint and Chemical Corporation,* 298 F.Supp. 373 (D.Md.1969); *Holfield v. Power Chemical Company,* 382 F.Supp. 388 (D.Md.1974); *McLaughlin v. Copeland,* 435 F.Supp. 513 (D.Md.1977); *United Merchants and Manufacturers, Inc. v. David and Dash, Inc.,* 439 F.Supp. 1078 (D.Md.1977).

Subsection (2) deals, *inter alia,* with a defendant who "[c]ontracts to supply ... services ... in the State." In analyzing this subsection, Professor Auerbach, *op. cit.,* discusses the subsection in light of *McGee v. International Life Insurance Company, supra,* discussed above. Professor Auerbach concludes, at 36–37:

"This subsection authorizes jurisdiction over a defendant who has never been in the state. Jurisdiction is asserted on the basis of a contractual obligation to perform certain acts in the state. Does the due process clause permit a state to take jurisdiction over a cause of action arising out of a particular transaction where, although the transaction in its totality has some contact

with the state, the defendant at all times has acted outside the state?

Nowhere in the *International Shoe* opinion is there any discussion of this question. The *McGee* case does have relevance to this inquiry. There, the defendant insurance company serviced an insurance policy of a California resident at all times through the mails. No agent of the company was ever physically present in California. Yet, the company was held subject to California jurisdiction as to a cause of action arising out of the policy, since 'the suit was based on a *contract* which had substantial connection' with California."

Subsection (6) deals, *inter alia,* with "[c]ontracts to insure ... any person ... [or] risk ... located ... within the State." Professor Auerbach, *op. cit.,* discussed how this provision of the "long-arm" statute is broader in its coverage than the Maryland Unauthorized Insurers False Advertising Process Act. He reasoned, at 46:

"However, the 1964 statute [the "long-arm" statute], even in its brevity, has a wider sweep than the 1949 act [the Unauthorized Insurers Process Act]. The latter provides for jurisdiction over foreign insurance companies in actions concerning policies issued to residents of the state or to corporations authorized to do business in the state. The former asserts jurisdiction where the policy insures any 'person, property or risk' located in the state. *A policy entered into outside the state with a non-resident of the state covering property in the state would be included under the 1964 statute, though not under the 1949 act.* It is true that the 1949 act also covers 'any other transaction of insurance business' in the state. But it is doubtful that this phrase covers an insurance contract entered into outside the state by non-residents." (Emphasis supplied).

The present case would be covered by that reasoning if "insured medical payments" were to be deemed the equivalent of "insured property." We see no principled distinction between the two. Pamela Ferguson, moreover, was both a

"person" insured under the policy and a "person" who was "located in the state" throughout the period of her treatment by Chestnut Lodge.

Accordingly, we must reverse the decision of the Circuit Court for Montgomery County granting Blue Cross's Motion Raising Preliminary Objection and entering judgment in favor of it.

JUDGMENT REVERSED AND CASE REMANDED FOR TRIAL; COSTS TO BE PAID BY APPELLEE.