LEWRON TELEVISION, INC. *v.* INTERNATIONAL
ALLIANCE OF THEATRICAL STAGE EM-
PLOYEES AND MOVING PICTURE
.MACHINE OPERATORS OF THE
UNITED STATES AND
CANADA

[No. 40, September Term, 1977.]

*Decided October 20, 1977.*

The cause was argued before DAVIDSON, MOORE and LOWE,
JJ.

*Jay V. Strong, Jr.,* with whom was *Edward L. Blanton,
Jr.,* on the brief, for appellant.

*Jeffrey L. Gibbs*, with whom were *I. Duke Avnet* and *George H. Cohen* on the brief, for appellee.

MOORE, J., delivered the opinion of the Court.

This appeal, involving the application of the long-arm statute, Md. Cts. & Jud. Proc. Code Ann. § 6-103 (1974), to a labor union International, has already acquired a three-year history. Plaintiff-appellant has not, thus far, advanced beyond the stage of service of process. Our mandate leaves it at the starting line.

I

In September 1974 the plaintiff, Lewron Television, Inc., a Maryland corporation, filed a Declaration in the Superior Court of Baltimore City charging the defendant, International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators of the United States and Canada (hereinafter the "International") with intentional interference with contractual relations, and seeking more than $11 million in compensatory and punitive damages. The International is an unincorporated association which maintains its principal office in New York City. Service of process was made in Baltimore upon an officer of Local 833 of the union. The defendant International moved to quash service on the ground that the Local was an entity separate and distinct from the International, and was not authorized to accept service on behalf of the International. On January 2, 1975, Judge James W. Murphy granted the motion to quash, with leave to reissue under the Maryland Rules.

Plaintiff's summons was reissued and, in February 1975, Walter F. Diehl, the President of the International, was served by mail in New York City, pursuant to Rule 107. Defendant filed a new motion to quash service, stating that the Declaration failed to allege any facts tending to show that the defendant was doing business in Maryland, as required under the long-arm statute, or that jurisdiction would be consistent with Fourteenth Amendment due process. On May 22, 1975, Judge Murphy granted the second

motion to quash, finding plaintiff had "failed to establish that Defendant directly or by an agent 'regularly does or solicits business, engages in any other persistent course of conduct in the state or derives substantial revenue from goods, food, services or manufactured products used or consumed in the state.' See: *Zinz v. Evans & Mitchell Industries, 22 Md. App. 126.*"

Prior to the court's ruling, plaintiff had prepared a "Response" to defendant's reply to a memorandum of points and authorities in opposition to the motion to quash. This document, in which plaintiff requested time for discovery proceedings, had evidently not been received when the motion to quash was granted. Therefore, on June 12, 1975, Judge Murphy vacated the judgment previously entered, and granted the plaintiff sixty days to complete discovery on the question of whether jurisdiction over the defendant was conferred by the long-arm statute.

Following discovery, a hearing was held on June 1, 1976 before Judge Shirley B. Jones and, after the submission of post-hearing briefs by both parties, defendant-appellee's motion to quash service on the ground of lack of jurisdiction was granted. This appeal was taken from Judge Jones' ruling.

II

The ultimate question before us may be stated quite succinctly: Did the defendant International have the requisite "minimum contacts" with the State of Maryland to be subject to suit on a cause of action which did not arise in this State? The lower court twice answered this question in the negative, and we agree.

In determining whether the Maryland courts may exercise *in personam* jurisdiction over an out-of-state defendant, the provisions of the long-arm statute, Md. Cts. & Jud. Proc. Code Ann. § 6-103 (1974), must be satisfied in a manner not inconsistent with the due process clause of the Fourteenth Amendment to the federal constitution. *Malinow v. Eberly*, 322 F. Supp. 594 (D. Md. 1971). Due process is, of course, the

primary consideration, and its requirements were enunciated by the Supreme Court in the now familiar case of *International Shoe Co. v. Washington,* 326 U. S. 310 (1945), in an opinion by Chief Justice Stone:

> "[D]ue process requires only that in order to subject a defendant to a judgment *in personam,* if he be not present within the territory of the forum, he have certain *minimum contacts* with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " 326 U. S. at 316. (Citations omitted; emphasis added.)

Although due process may be satisfied where the contacts of the out-of-state party are relatively few based on the "quality and nature of the activity," *Id.* at 319, "it has been generally recognized that the *casual presence* of the corporate agent or even his conduct of *single or isolated items of activities* are not enough to subject it to suit on causes of action *unconnected with the activities there." Id.* at 317. (Emphasis added.) *See also Hanson v. Denckla,* 357 U. S. 235 (1958); *McGee v. International Life Insurance Co.,* 355 U. S. 220 (1957).

The Maryland long-arm statute, now codified at § 6-103 of the Courts Article, was enacted in 1964 for the purpose of extending personal jurisdiction over out-of-state parties to the fullest extent constitutionally permissible. *Malinow v. Eberly, supra,* at 598; *Van Wagenberg v. Van Wagenberg,* 241 Md. 154, 215 A. 2d 812, *cert. denied,* 385 U. S. 833 (1966); *Geelhoed v. Jensen,* 277 Md. 220, 352 A. 2d 818 (1976); and "the reach of the statute will largely depend upon whether Maryland *in personam* jurisdiction may be asserted under the Fourteenth Amendment." *Krashes v. White,* 275 Md. 549, 559, 341 A. 2d 798, 804 (1975).

It is not disputed that the instant appeal involves only the application of § 6-103 (b) (4) of the statute. This section provides:

> "(b) In general. — A court may exercise personal

jurisdiction over a person who directly or by an agent:

\* \* \*

"(4) Causes tortious injury in the state *or outside of the state* by an act or omission outside the state if he regularly does or solicits business, engages in any other persistent course of conduct in the state or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the state [.]" (Emphasis added.)

While *in personam* jurisdiction thus may be obtained over an out-of-state defendant even where the alleged injury has occurred outside Maryland, in such a case due process requires "other contacts between the [defendant] and the state [to] be *fairly extensive* before the burden of defending a suit there may be imposed ... without offending 'traditional notions of fair play and substantial justice.' " F. James, *Civil Procedure* 640 (1965); *Ratliff v. Cooper Laboratories, Inc.*, 444 F. 2d 745, 748 (4th Cir.), *cert. denied*, 404 U. S. 948 (1971); *Egeria, Societa di Navigazione Per Azioni v. Orinoco Mining Co.*, 360 F. Supp. 997 (D. Md. 1973).

### III

Having stated the constitutional and statutory guidelines which govern our decision in this case, we shall relate the operative facts as we have gleaned them from the record.

The International, as previously noted, is an unincorporated association having its principal office in New York. It maintains no office in Maryland, but does have a branch office in Los Angeles, California. Approximately 900 local unions throughout the United States and Canada are affiliated with the International. It has approximately 65,000 members of whom approximately 190 are members of two locals in this State. It maintains no bank accounts in Maryland, has no accounts receivable from Maryland nor any interest in Maryland real property, nor does it have any investments of any kind within the State.

None of the acts of the International upon which plaintiff's claims are based was committed in Maryland. Rather, the alleged tortious conduct occurred in New York and California.

The Constitution of the International sets forth the purposes of the organization, and explains the powers of the International vis-à-vis the locals. Such purposes are expressed, in Article One, Section 2, as the improvement of social and economic conditions for employees in the various fields of endeavor encompassed by the union's membership, the assurance of employment for members, and the maintenance of fair wage payments. The membership of the International comprises, for the most part, the members in good standing of all locals holding a charter from the International.

Several sections of the Constitution indicate powers which the International holds over its local units. Article Seven, Section 9 states that the International President may order the officers of a local to submit its books and records for inspection whenever it may be deemed expedient. Section 10 of the same article allows the President to order members to refrain from rendering service to employers who may be indebted to other members. The President is further given the power, by Section 16, to invoke sanctions against local unions for failure to meet financial obligations to the International, or even, in certain emergency situations, to "take over all books, records, credits and property of such union of every nature whatsoever. . . ."

Revenues from the local are derived by the International for certain items, described in Article Fourteen of the Constitution: a "per capita tax" is imposed on locals in accordance with their active and retired membership; and a charter fee of $100 is also charged locals wishing to affiliate with the International. In addition, a defense fund has been established through assessment of individual members, such monies to be used to defray legal and other expenses, where a local was "faced with an unauthorized strike or a lock-out."

Article Nineteen of the International's constitution focuses upon the "Powers and Duties of Local Unions." This

Article makes clear that the locals are autonomous bodies, independent in all major respects, except for the fact that they have chosen to associate themselves with a central advisory unit, namely, the International. Section 2 is particularly revealing, and we quote it in its entirety:

"Section 2. Home Rule.
    Home Rule is granted to all affiliated local unions of this Alliance and this shall be construed to confer upon each local union the authority to exercise *full and complete control over its own affairs;* provided, however, that no local union shall take any actions or adopt any laws which conflict with any portion of the Constitution and By-Laws." (Emphasis added.)

The affiliated locals, under Section 3, are empowered to adopt their own constitutions and by-laws for self-government, although the approval of the International President is required for such documents. Further evidence of the autonomy of the locals is provided in Section 15, which permits locals to "execute written contracts with local managers and other employers regulating conditions of employment of all members within their jurisdiction." Each local was authorized "to fix the scale of wages within its jurisdiction."

We note also, from an affidavit of the International's President contained in the record, that the sum of the local's powers is quite broad: the local has its own constitution and by-laws; maintains its own treasury; nominates and elects its own officers; conducts its own meetings; collects its own fees and dues; passes upon the qualifications of all membership applicants; *"engages in its own organizing activities, negotiates its own contracts with employers and administers such contracts on its own including the handling of grievances with employers";* [1] institutes its own legal and

---

1. The International further stated, in answer to plaintiff's interrogatories, that it "does not participate in bargaining between employers and locals unless the local encounters a serious disagreement with the employer and asks the International for assistance ... but ... [the International] has no power to consummate an adjustment unless it meets

arbitration proceedings and enters into settlements without approval by the International; determines its own expenditures, and, *"in general, establishes its own policies, vis-à-vis employers and with respect to internal matters and conducts its own affairs without supervision by the International."* (Emphasis added.)

## IV

As we understand appellant's position, two closely related arguments must be considered in determining whether the International should be subject to the jurisdiction of the Maryland courts. First, we must decide whether the activities of the International in Maryland satisfy the "minimum contacts" test of due process. Second, it must be determined whether the relationship between the International and the locals in Maryland is one of *principal and agent*, whereby the activities of the local are to be attributed to the International, thereby complying with due process and the requirements of the long-arm statute. We now consider the cases on both issues.

The appellant relies heavily in its brief upon a New Jersey case in which the same International before us now was a party. In *Moran v. International Alliance of Theatrical Stage Employees,* 52 A. 2d 531 (N.J. Ch. 1947), plaintiff, a New Jersey resident and unemployed projectionist, filed a bill in equity against the defendant International and a New Jersey local to compel acceptance of his membership application. The court noted that the International exercised a degree of centralized supervision over its constituent locals, and often sent representatives to assist the locals in various matters.[2] The chancellor found that the

---

with the approval of the affected local." We are further told that the International has been called upon to render such assistance to its Baltimore locals only four times in the past ten years.

2. The opinion in *Moran* sets forth insufficient facts for us to determine whether the International, at that time, had any greater degree of control over its locals than it does now.

International *was* amenable to service of process in New Jersey, stating:

> "I am of the opinion that an association which grants rights and imposes duties on its individual members wherever located and which claims every state of the Union as its field of operation through the establishment in those states of component parts of its organization, by which units or agencies it engages in activities designed to further the objects for which it was organized, which objects can be achieved only through the operation of its units, should be regarded as voluntarily submitting itself to the jurisdiction of those states when duly served with process and should not be permitted to say that it is amenable only to the courts of the state in which it maintains its headquarters." 52 A. 2d at 534.

We do not regard the *Moran* case as persuasive authority. The decision contains no mention of the then newly-enunciated due process jurisdictional requirements in *International Shoe, supra,* and it is somewhat unclear, because of a dearth of reported facts, as to whether the court relied upon the International's own contacts with New Jersey, or the activities of the local, as agent for the International. Furthermore, the injury alleged by the plaintiff occurred in New Jersey, by virtue of the union's refusal to accept his membership application in that state.

The activities of Internationals were found to be of sufficient scope for jurisdiction to be exercised locally in *International Union of Operating Engineers v. J. A. Jones Construction Co.,* 240 S.W.2d 49 (Ky. 1951) and *Edgar v. Southern Railway Co.,* 49 S.E.2d 841 (S.C. 1948). In *Jones,* the local and International had a common constitution, delegating all supervisory rights to the International; labor agreements were also subject to the approval of the International. In *Edgar,* the International had established committees for adjustment of disputes with employers, and it prosecuted all activities as would a local labor union. The

above two cases were cited with approval in *Beaty v. International Association of Heat & Frost Insulators*, 102 S.E.2d 763 (N.C. 1958), in which the court held that the International was "doing business" in North Carolina where it exercised complete dominion over the activities of local units and supervised contract negotiation with employers. The *Beaty* court noted: "International unions with Charter provisions similar to the ones here considered have, through their control and dominance of local unions, been held, in well-considered cases in other States, to be doing business in places other than the place of their residence." 102 S.E.2d at 766-767. *See also Spica v. International Ladies Garment Workers' Union*, 130 A. 2d 468 (Pa. 1957).

The rule in every jurisdiction which has considered this issue appears to be that the degree of control exercised by the out-of-state International over its constituent local determines whether the International will be subject to the jurisdiction of the courts of the forum. One of the most significant controls of the International is its participation in collective bargaining negotiations with employers. In *Brooks v. International Brotherhood of Boilermakers*, 114 N.W.2d 647 (Minn. 1962), plaintiff alleged that the defendant International had wrongfully ratified and refused to investigate the local's expulsion of him from its chapter. The court, in considering whether the International was subject to suit in Minnesota, noted that it had engaged in extensive control over the local's activities, including participation in collective bargaining agreements with employers. It was held that the exercise of jurisdiction over the International was constitutional, especially in view of the fact that plaintiff's cause of action was "closely tied up with the harm resulting from defendant's many activities in [the] state. . . ." 114 N.W.2d at 654. *See also Calagaz v. Calhoon*, 309 F. 2d 248 (5th Cir. 1962).

Other cases have considered the more narrow question of whether the local may be considered the "agent" of the International for purposes of satisfying due process and statutory requirements for the exercise of jurisdiction. We note, before discussing those cases, that the mere fact that

an International and its constituent locals are "separate entities" does not establish that the local may not be the agent of the International, as suggested in the International's brief in this case. *But see United Slate Tile and Composition Roofers Local 80 v. United Brotherhood of Carpenters and Joiners of America Local 101,* 185 Md. 32, 42 A. 2d 913 (1945) and *Martin v. United Slate, Tile and Composition Roofers,* 189 Md. 383, 56 A. 2d 28 (1947).

In *EEOC v. Raymond Metal Products Co.,* 385 F. Supp. 907, 911 (D. Md. 1974), *aff'd in part, rev'd in part,* 530 F. 2d 590 (4th Cir. 1976),[3] "[t]he presence or absence of an agency relationship between the [International and local] [was] the critical factor in determining [the] Court's jurisdiction over the International." *See also Moody v. Albemarle Paper Co.,* 271 F. Supp. 27, 29 (E.D.N.C. 1967). The court in *Raymond Metal Products,* in an opinion by Chief Judge Northrop, held that agency *was* established as between the International and the local, and service upon the local was sufficient to obtain jurisdiction over the International. The existence of an agency relationship was based upon a provision in a labor-management agreement between the local and the employer that the former would act as representative for the International.[4]

The issue before the court in *Isbrandtsen Co. v. National Marine Engineers' Beneficial Association,* 9 F.R.D. 541 (S.D.N.Y. 1949), was again whether a local, subordinate association was the agent of the national association, thereby validating service upon the business manager of the local in a suit against the national union. The court held in this case that service upon the local was improper, since the "national and local [were] autonomous entities," 9 F.R.D. at 544, the local having its own officers, distinct from the national's officers, and being capable of retaining its own assets in the event its charter was revoked by the national. Further, the constitution of the national union, viewed as a

---

3. The issue discussed herein was not a part of the matter appealed.

4. We fail to understand the appellee's contention that a "separate legal entity," *i.e.,* the local, can *never* be an agent for the International, in view of the fact that its counsel represented the International in the above case.

whole, did not indicate an agency relationship with the local. *Id.* at 543.

*Finally, in Claycraft Co. v. UMW,* 204 F. 2d 600 (6th Cir. 1953), the issue presented was "whether District 50 and the International [were] separate autonomous entities, or whether District 50 [was] merely a part of the International and an agency through which it carrie[d] on its work." 204 F. 2d at 601. The court found that the local union was an agent for the International, since District 50 did not have its own constitution, and " 'general and complete supervision over, and administration of the affairs of the District,' " under its "rules," were in the hands of an administrative officer of the International. *Id.*

## V

It is clear in this case that the activities of the International itself in Maryland are not of sufficient magnitude for it to be constitutionally subject to the jurisdiction of the courts in this state. A very small percentage of its membership, less than one-third of one percent, resides in Maryland, and its activities in Maryland have been limited to rare occasions when it has participated in collective bargaining conferences, at the request of the local. The International and local are "separate entities," having their own by-laws and constitutions. Certainly, there is an affiliation between the two organizations. We do not believe, however, that the connection between them is such as to render the local a mere arm of the International, whereby the local's activities and those of the International may properly be considered one and the same.

Jurisdiction over the International in Maryland may not be obtained under the long-arm statute or in a manner consistent with due process. The law is settled that the contacts of an out-of-state entity must be "fairly extensive" before it will be subject to the jurisdiction of the forum, where the cause of action occurred *outside* the forum's boundaries. *International Shoe Co. v. Washington, supra; Ratliff v. Cooper Laboratories, Inc., supra.* None of the

plaintiff's claims, by any stretch of the imagination, mãy be said to have arisen in Maryland, caused injury in Maryland, or to be connected in any way with this jurisdiction. Since the plaintiff has obviously conducted business in the two states where its causes of action appear to have arisen, in both of which the International maintains business offices, it is clear to us that Maryland has no legitimate interest in this matter, and no power to subject the defendant to the jurisdiction of its courts.

*Judgment affirmed; appellant to pay the costs.*