**John Clark DONATELLI,**
Plaintiff, Appellee,

v.

**NATIONAL HOCKEY LEAGUE,**
Defendant, Appellant.

No. 89–1681.

United States Court of Appeals,
First Circuit.

Heard Nov. 9, 1989.

Decided Jan. 12, 1990.

460

Herbert Dym, with whom Bingham B. Leverich, Bruce N. Kuhlik, Kenneth J. Diamond, Covington & Burling, Christopher H. Little, John Voorhees, Fran R. Robins–Liben, and Tillinghast, Collins & Graham were on brief for defendant, appellant.

Martin W. Aisenberg, with whom Robert S. Thurston, Jones & Aisenberg, John B. Harwood, and McKinnon & Harwood were on brief for plaintiff, appellee.

Before BOWNES, VAN GRAAFEILAND * and SELYA, Circuit Judges.

* Senior Circuit Judge, of the Second Circuit, sitting by designation.

SELYA, Circuit Judge.

After plaintiff-appellee John Clark Donatelli sued the National Hockey League (NHL), the United States District Court for the District of Rhode Island refused to dismiss the case for want of personal jurisdiction. *Donatelli v. NHL,* 708 F.Supp. 31 (D.R.I.1989). Believing that its order "involve[d] a controlling question of law as to which there is substantial ground for difference of opinion, and an immediate appeal ... m[ight] materially advance the ultimate termination of the litigation," 28 U.S.C. § 1292(b), the district court asked us to review immediately its conclusion that "an unincorporated association is subject to the general personal jurisdiction of every court having jurisdiction over one of its members." *Donatelli,* 708 F.Supp. at 38. Impressed by the issue's novelty and importance, and by the district court's concern, we allowed an interlocutory appeal.

The district court's *in personam* jurisdiction in this case was invoked pursuant to Rhode Island's longarm statute, R.I.G.L. § 9–5–33 (1985 Reenactment). Because the state has consistently characterized the reach of that statute as coextensive with the outermost limits of the Due Process Clause, *see, e.g., Bendick v. Picillo,* 525 A.2d 1310, 1312 (R.I.1987); *Conn v. ITT Aetna Finance Co.,* 105 R.I. 397, 252 A.2d 184, 186 (1969), we conduct our analysis exclusively in terms of whether the lower court's assertion of jurisdiction was constitutionally permissible. We conclude it was not.

## I

It would be pleonastic to rehearse the case's background and travel anew, as these subjects are brightly illumined in the opinion below. *See Donatelli,* 708 F.Supp. at 32–33, 35. Suffice it to say that the NHL is a 21–member unincorporated association which sponsors a professional ice hockey league. Each member operates a team; the teams are distributed throughout various metropolitan areas in the United States and Canada; each team bears the name of its home city (*e.g.,* "New York Rangers," "Winnipeg Jets"); and the league is comprised of the 21 teams. The clubs are independently owned entities, structured as their owners please. Some operate as corporations, some as partnerships, and some as joint ventures.

The members comprise the league, but the league does not dominate the members. The NHL is run by a board of governors consisting of one representative from each member team, but has no ownership interest in any team. It exercises no control over the day-to-day business operations of any team and receives no substantial part of the teams' revenues (although the league's operating budget is funded by the teams on an equal-share basis). The clubs perform virtually all of their crucial functions (*e.g.,* player recruitment, ticket sales, broadcast arrangements, furnishing of equipment and premises, concession arrangements, advertising) independently of the league. The NHL does perform one uniquely vital task: it establishes and monitors the regular-season playing schedule and postseason playoffs (but not the preseason exhibition games). The NHL maintains its own offices and staff; adopts and enforces by-laws governing the sport; operates a scouting network [1]; conducts an annual player draft; determines player eligibility; promulgates playing rules; and furnishes referees and linesmen to officiate at the games. The league also sells the rights to televise regular-season and playoff games throughout the United States and Canada; the proceeds go to the member clubs.

The clubs own a separate corporation, National Hockey League Services, Inc. (NatServ), chartered in New York. NatServ is the assignee of the NHL logo (which the teams collectively own) and of the right to use all the team names and logos for various product endorsements. In turn, NatServ subcontracts these rights to an independent firm, Licensing Corpora-

---

**1.** This network is supplementary to, and altogether distinct from, the scouting operations which each club conducts to its own behoof.

tion of America (LCA). LCA deals directly with an array of advertisers and manufacturers and makes royalty payments to NatServ. After defraying its operating expenses, NatServ remits all surplus revenues to its shareholders (the 21 teams). None of the income earned by NatServ inures to the NHL.

Donatelli is a hockey player of some skill. He brought this action in a Rhode Island state court to challenge the NHL player draft and the league's failure to declare him a "free agent," entitled to negotiate for his services with any and all teams.[2] The case was timely removed. Thereafter, the district court found, and the parties do not dispute, that Donatelli's suit was unrelated to the NHL's or its members' contacts in Rhode Island. *Id.* at 34. The court also found that, although the NHL itself had no presence within Rhode Island sufficient to justify the exercise of general jurisdiction, it was nevertheless "subject to the general personal jurisdiction of every court having general personal jurisdiction over one of its member clubs." *Id.* at 36. Because at least one such team (the Boston Bruins) had minimum contacts with the forum, *id.*, the court believed that in personam jurisdiction over appellant devolved "through the contacts of the Bruins." *Id.* at 38. Accordingly, the court declined to shelve the suit.[3]

## II

In the late 1930s, Winston Churchill disclaimed any ability to forecast the Soviet Union's reaction to Nazi aggression, reputedly terming the Russian colossus "a riddle wrapped in a mystery inside an enigma." That phrase might just as aptly describe the doctrinal vagaries of the concept of personal jurisdiction. Inasmuch as we today confront what appears to be an open question, we must winnow the salient policies and concerns underlying the development of Supreme Court doctrine in order to be able to formulate a method, and then a rule, of decision. Hence, we believe it wise, if time consuming, to analyze certain landmark cases and extrapolate the underlying values relevant to a reasoned determination of whether (and if so, how) the activities of members of an unincorporated association ought to affect the forum's ability to assert personal jurisdiction over the association itself.

In a very real sense, concepts of personal jurisdiction entered the modern era with the watershed opinion in *International Shoe Co. v. State of Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). *International Shoe* signalled a clear retreat from the somewhat mechanical approach to jurisdictional inquiries previously demanded by *Pennoyer v. Neff*, 95 U.S. 714, 24 L.Ed. 565 (1878), and its progeny. *See, e.g.,* Hazard, *A General Theory of State-Court Jurisdiction*, 1965 Sup.Ct.Rev. 241, 245–72 (1965); Note, *Developments in the Law—State Court Jurisdiction*, 73 Harv. L.Rev. 909, 919–23 (1960). In *International Shoe*, the Court ushered in a more functional analytic scheme, one geared toward assessing the inherent fairness of compelling a party to submit to the suzerainty of a particular state's courts. To that end, the Court promulgated the now-familiar standard of "minimum contacts," hinging the concept rather firmly to "traditional notions of fair play and substantial justice." 326 U.S. at 316, 66 S.Ct. at 158 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)).

The Court also spotlighted the importance of distinguishing between "specific" personal jurisdiction (*i.e.*, jurisdiction which a state may assert when a suit arises directly out of forum-based activities) and "general" personal jurisdiction (*i.e.*, jurisdiction which may be asserted in connection with suits not directly founded on forum-

---

**2.** Donatelli has since achieved free agency under the NHL's rules and is currently playing in the league. He continues to press this action, however, in search of money damages for past periods.

**3.** The court did dismiss plaintiff's complaint as to a codefendant, Edmonton Oilers Hockey Corp. (Edmonton), for want of jurisdiction. *Donatelli,* 708 F.Supp. at 36. In this appeal, plaintiff does not contest dismissal as to Edmonton (the corporate operator of the NHL team which "owned" his draft rights when suit was started).

based conduct). *Id.* 326 U.S. at 317–18, 66 S.Ct. at 158–59; *see generally* Von Mehren & Trautman, *Jurisdiction to Adjudicate: A Suggested Analysis,* 79 Harv.L.Rev. 1121, 1136–63 (1966) (discussing distinction). In this case, our focus is upon—and our subsequent discussion concerns—general as opposed to specific jurisdiction. Donatelli's suit does not stem from any activities conducted, or torts committed, by appellant within Rhode Island. Because plaintiff's claims do not arise out of, and are not directly related to, defendant's contacts with the forum state, specific jurisdiction is lacking. *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 1872 n. 8, 80 L.Ed.2d 404 (1984); *see also Donatelli,* 708 F.Supp. at 34. In order to maintain the action in Rhode Island, therefore, plaintiff must demonstrate the existence of general jurisdiction anent the NHL. And, "[a]lthough minimum contacts suffice in and of themselves for specific jurisdiction under *International Shoe,* the standard for general jurisdiction is considerably more stringent." *Glater v. Eli Lilly & Co.,* 744 F.2d 213, 216 (1st Cir.1984) (footnote omitted).

Explicating the constitutional perimeters of general jurisdiction, *International Shoe* warned that a corporation's "single or isolated items of activities in a state ... are not enough to subject it to suit on causes of action unconnected with the activities there." 326 U.S. at 317, 66 S.Ct. at 159. Contrastingly, the Court mentioned "instances in which the continuous corporate operations within a state were thought so substantial and of such a nature as to justify suit against [a corporate defendant] on causes of action arising from dealings entirely distinct from those activities." *Id.* at 318, 66 S.Ct. at 159. Finally, for perhaps the first time, the Court recognized reciprocity as a significant jurisdictional consideration, reasoning that a party who enjoys the benefits of conducting business in a particular forum should be willing to bear the correlative burden of submitting to the forum's courts. *Id.* at 319, 66 S.Ct. at 159.

State sovereignty, the bellwether of the *Pennoyer* line of cases, was downplayed in *International Shoe.* Yet in succeeding years, the Court tied together the flexible standard of *International Shoe* and the state sovereignty prong of *Pennoyer.* For instance, in *Hanson v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), the Court reminded its audience that restrictions on personal jurisdiction

> are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States. However minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had the "minimal contacts" with that State that are a prerequisite to its exercise of power over him.

*Id.* at 251, 78 S.Ct. at 1238. The *Hanson* Court reiterated the importance of reciprocity, *id.* at 252, 78 S.Ct. at 1239, and also introduced the idea of "purposeful availment" into the jurisprudence of personal jurisdiction:

> The application of [the minimum contacts] rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.

*Id.* at 253, 78 S.Ct. at 1240. *Cf. Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437, 438, 72 S.Ct. 413, 414, 96 L.Ed. 485 (1952) (where foreign corporation carries on "a continuous and systematic, but limited, part of its general business" within the forum, general jurisdiction attaches).

In ensuing decisions, the Supreme Court expounded upon the theme of fairness and substantial justice, and the juxtaposition of that theme with state sovereignty. *See, e.g., Shaffer v. Heitner,* 433 U.S. 186, 203–04, 97 S.Ct. 2569, 2579–80, 53 L.Ed.2d 683 (1977). It became crystal clear that the tri-cornered "relationship among the defendant, the forum, and the litigation, rather

than the mutually exclusive sovereignty of the States," now occupied center stage and was "the central concern of the inquiry into personal jurisdiction." *Id.* at 204, 97 S.Ct. at 2580; *see also Rush v. Savchuk,* 444 U.S. 320, 327, 100 S.Ct. 571, 576, 62 L.Ed.2d 516 (1980). The emergent emphasis on the triangular nexuses led to the incidence of "purposeful availment" as a frequently employed unit of measurement. *See, e.g., Kulko v. Superior Court,* 436 U.S. 84, 94, 98 S.Ct. 1690, 1698, 56 L.Ed.2d 132 (1978). Regardless, sovereignty—though no longer the cynosure—was far from a dead letter. The Court made that plain in *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), wherein it wrote:

> The concept of minimum contacts ... can be seen to perform two related, but distinguishable functions. It protects the defendant against the burdens of litigating in a distant or inconvenient forum. And it acts to ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system.

*Id.* at 291–92, 100 S.Ct. at 564. Although recognizing that other factors were deserving of weight, *id.* at 292, 100 S.Ct. at 564, the Court reaffirmed that sovereignty was a bridge that inevitably required crossing:

> Even if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State; even if the forum State has a strong interest in applying its law to the controversy; even if the forum State is the most convenient location for litigation, the Due Process Clause, acting as an instrument of interstate federalism, may sometimes act to divest the State of its power to render a valid judgment.

*Id.* at 294, 100 S.Ct. at 565.

*Volkswagen* is also important because it introduced an explicit "foreseeability" element into the liturgy of minimum contacts. The development seems reflective of a natural evolutionary process, as "foreseeability" and "purposeful availment" bear a family resemblance (the former defining the latter to a considerable extent): a party who purposefully avails himself of the forum's benefits and privileges should reasonably anticipate that obligations may accompany the harvest. According to *Volkswagen,* "the foreseeability that is critical to due process analysis is ... that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Id.* at 297, 100 S.Ct. at 567.

Subsequent decisions followed the *Volkswagen* blueprint. *See, e.g., Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984); *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Thereafter, in *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), the Court reaffirmed that "the constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum State." *Id.* at 474, 105 S.Ct. at 2183. Only if—and after—minimum contacts have been shown to exist may such contacts "be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Id.* at 476, 105 S.Ct. at 2184 (quoting *International Shoe,* 326 U.S. at 320, 66 S.Ct. at 160).

The *Burger King* Court retained the dichotomy between general and specific jurisdiction. *Id.* 471 U.S. at 473 n. 15, 105 S.Ct. at 2182 n. 10. It also reemphasized a concern for the criteria regularly utilized in the post-World War II era for determining the constitutional propriety of assertions of general personal jurisdiction (*e.g.* notice and predictability, *id.* at 472, 105 S.Ct. at 2181, foreseeability, *id.,* and reciprocity, *id.* at 475–76, 105 S.Ct. at 2183–84), notwithstanding that many of these criteria were created under a conceptual framework which used state sovereignty as a linchpin. While maintaining the hierarchy of minimum contacts and stressing the "purposeful availment" requirement as one ensuring "that a defendant will not be haled into a jurisdiction solely as a result of 'random,'

'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person,'" *id.* at 475, 105 S.Ct. at 2183 (citations omitted), *Burger King* mentioned five other criteria relevant to "fair play and substantial justice": the plaintiff's interest in obtaining convenient and effective relief; the burden imposed upon the defendant by requiring it to appear; the forum's adjudicatory interest; the interstate judicial system's interest in the place of adjudication; and the common interest of all affected sovereigns, state and federal, in promoting substantive social policies. *Id.* at 477, 105 S.Ct. at 2184 (citing *Volkswagen*, 444 U.S. at 292, 100 S.Ct. at 564); *see also Asahi Metal Indus., Inc. v. Superior Court*, 480 U.S. 102, 107 S.Ct. 1026, 1033–34, 94 L.Ed.2d 92 (1987).

■ Based on these precedents, the judicial inquiry into general jurisdiction has two stages. A reviewing court must first examine the defendant's contacts with the forum. If the same do not exist in sufficient abundance, that is, if the constitutionally necessary first-tier minimum is lacking, the inquiry ends. If, however, the minimum exists, the criteria catalogued by the Court must be assessed in order to determine the constitutionality, in the particular circumstances, of an exercise of jurisdiction. *See, e.g., Keeton*, 465 U.S. at 775, 104 S.Ct. at 1478 ("[t]he contacts between respondent and the forum must be judged in light of [the] claim [asserted by plaintiff and].... must be such that it is 'fair' to compel respondent to defend" against that claim in the forum state). At that stage, the criteria may work either to shrink the minimum contacts threshold (thus facilitating the assertion of general jurisdiction) or to defeat general jurisdiction entirely. *Burger King*, 471 U.S. at 477, 105 S.Ct. at 2184. In other words, the criteria (or "Gestalt factors," one might say) are secondary rather than primary; unless the defendant has some cognizable contacts with the proposed forum, the court cannot assert general jurisdiction. *Id.* at 477–78, 105 S.Ct. at 2184–85.

### III

It is against this chiaroscuro backdrop that we must attempt to formulate a method for determining when, if at all, general in personam jurisdiction is conferred over an unincorporated association which does not itself conduct significant activities within the forum. Specifically, this case asks a largely unanswered question: does the legal/institutional relationship between an unincorporated association and its members suffice to establish jurisdiction in the absence of other affiliating circumstances when a member, but not the association, has significant contacts with the forum? As one point of reference, we pause to scrutinize how courts have viewed other legal/institutional relationships in analogous contexts. Thereafter, we address the problem at hand.

### A

■ We start with the relationship between corporation and wholly-owned subsidiary. In general, the courts have presumed the institutional independence of parent and subsidiary when determining whether jurisdiction may be asserted over the parent solely on the basis of the subsidiary's contacts with the forum. *See, e.g., Cannon Manufacturing Co. v. Cudahy Packing Co.*, 267 U.S. 333, 336, 45 S.Ct. 250, 251, 69 L.Ed. 634 (1925); *Miller v. Honda Motor Co.*, 779 F.2d 769, 772 (1st Cir.1985); *Escude Cruz v. Ortho Pharmaceutical Corp.*, 619 F.2d 902, 905 (1st Cir. 1980). But, the fact of separate incorporation is not alone determinative of a court's constitutional power to assert personal jurisdiction over the parent based on the subsidiary's activities; rather, "[t]here is a presumption of corporate separateness that [may] be overcome by clear evidence." *Escude Cruz*, 619 F.2d at 905. Despite the fact that corporate entities are distinct and their veils unpierced, courts can—and usually do—make an actual inquiry into the nature of the interrelationship before abandoning the jurisdictional quest.

In those cases where personal jurisdiction over the parent has been found to exist, there is invariably a "plus" factor—

something beyond the subsidiary's mere presence within the bosom of the corporate family. Sometimes, the parent has utilized the subsidiary in such a way that an agency relationship between the two corporations can be perceived—and that is enough. *See, e.g., Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 420 (9th Cir. 1977); *Milligan v. Anderson*, 522 F.2d 1202, 1205–07 (10th Cir.1975); *Product Promotions, Inc. v. Cousteau*, 495 F.2d 483, 492 (5th Cir.1974); *Marsh v. Kitchen*, 480 F.2d 1270, 1272–73 (2d Cir.1973); *see also* 4 C. Wright & A. Miller, *Federal Practice and Procedures: Civil 2d* § 1069, at 364–66 (1987) (listing cases). On other occasions, jurisdiction has been premised on a finding of control—not merely the degree of control innately inherent in the family relationship, but the exercise of control by the parent "greater than that normally associated with common ownership and directorship." *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir. 1983); *see, e.g., Product Promotions*, 495 F.2d at 493; *cf. Mangual v. General Battery Corp.*, 710 F.2d 15, 21 (1st Cir.1983); *Volkswagen Interamericana, S.A. v. Rohlsen*, 360 F.2d 437, 441–42 (1st Cir.), *cert. denied*, 385 U.S. 919, 87 S.Ct. 230, 17 L.Ed.2d 143 (1966). The same result obtains when the subsidiary is merely an empty shell. *See, e.g., Escude Cruz*, 619 F.2d at 905; *Wells Fargo*, 556 F.2d at 421.

Requiring a "plus" factor can readily be reconciled with the Court's teachings. If the talisman of general jurisdiction is the purposeful establishment of minimum contacts with the forum, *Burger King*, 471 U.S. at 474, 105 S.Ct. at 2183, and if substance is not to be sacrificed on the altar of form, then actual control—an element vital to a determination of "purposeful" establishment—should override the artifice of separate legal incorporation. To the extent that a subsidiary enters the forum state as an agent for the parent, or in circumstances where the parent is exercising unusual hegemony over the subsidiary's operations and has dictated the entry, or where the subsidiary is a separate entity in name alone, the parent has plainly made a choice to avail itself of the forum's benefices. Since the essence of personal jurisdiction is to bring responsible parties before the court, a corporation which is actually responsible for its subsidiary's decision to undertake instate activities should, in all fairness, be within the state courts' jurisdictional reach. And, once minimum contacts can be attributed derivatively to the parent, the second-tier threshold is easily attained; all of the relevant secondary criteria (*e.g.*, notice, foreseeability, reciprocity, purposeful availment, and the other Gestalt factors) corroborate the appropriateness of an exercise of jurisdiction.[4]

**B**

We turn next to the legal/institutional relationship between partnership and partner. The general rule is that jurisdiction over a partner confers jurisdiction over the partnership. Primarily, this comes about because a partner is deemed by law and contract to be the partnership's general agent. *See* 59A Am.Jur.2d, *Partnership*, §§ 248–50 (1987); Restatement (Second) of Agency § 14A, comment a (1958). Thus, the activities of the partner are generally attributed to the partnership and jurisdiction over the partnership follows from the partner's contacts, if sufficient, regardless of the absence of independent contacts between the partnership *qua* entity and the forum. *See, e.g., Willis v. Semmes, Bowen & Semmes*, 441 F.Supp. 1235, 1238–40 (E.D.Va.1977); *First National Bank v. White*, 420 F.Supp. 1331, 1335 (D.Minn.1976). Except if the partner has acted beyond the scope of his legitimate duty or authority, *see* Uniform Partnership Act (UPA), § 9; *see also* 59A Am.Jur.2d,

---

**4.** The concern for notice and predictability, and the need for foreseeability, are satisfied by the parent's active role in the subsidiary's decision to establish a presence within the forum. The concern for reciprocity is satisfied because the parent presumably weighed the benefits it would derive before directing the subsidiary to enter the forum; thus, it should share the correlative burden of being amenable to the jurisdiction of the state's courts. In other words, the "plus" factor betokens that the parent "purposefully availed" itself of what the forum had to offer. The systemic increments of the Gestalt are equally easily met.

*Partnership*, § 257, agency is conclusively presumed, without regard to whether the partnership *actually* exercises control over the individual partner.

Attributing the partner's contacts to the partnership in the absence of actual control appears at first blush to violate the principle that minimum contacts must be purposefully established. It might be argued that, just as a corporate parent is responsible only for the activities of those subsidiaries it steers, a partnership should be responsible only for the activities of those partners it controls. But, that argument overlooks that a partnership, unlike a corporation, possesses no institutional existence apart from its partners. Unless the partner acts on behalf, and with the support, of the partnership within the ambit of the partnership agreement, he is merely an individual—not a partner at all; unless his acts are the partnership's acts, the partnership cannot act. Thus, the actions of a partner within the scope of a general partnership's purposes necessarily become the actions of the partnership. To attribute the partner's scope-of-business contacts to the partnership, therefore, is not only permissible, but mandated. For this reason, any forum able to exercise personal jurisdiction over the partner by reason of those activities must also be able to exercise jurisdiction over the partnership.

In this situation—as with the parent which tightly controls its subsidiary—the partner's contacts meet the constitutional requirement vis-a-vis the partnership: the partnership purposefully avails itself of the benefits and privileges of conducting business in the forum state whenever the partner does so because the latter is the former for the purposes of personal jurisdiction. Moreover, the secondary criteria unambiguously support an assertion of jurisdiction over the partnership in a state where the partner's contacts are pervasive.[5]

## C

Facially, both analogs are promising: the parent corporation or the partnership can readily be compared to an unincorporated association, whereas the subsidiary or the partner can be compared to an association member. In every case, the larger entity (parent corporation, partnership, or association) subsumes the smaller (subsidiary, partner, or member). Yet, neither comparison is a perfect fit. From a legal viewpoint, unincorporated associations are unlike corporations (which enjoy a presumed separateness and which must, in turn, comply with numerous formalities) or partnerships (wherein all general partners are jointly and severally liable in respect to the entity's business). Although the association seems more like a corporation in that it can be sued as an entity, in its own name, and a successful plaintiff must ordinarily execute on the association's funds rather than its members' funds, *see United Mine Workers v. Coronado Coal Co.*, 259 U.S. 344, 385–92, 42 S.Ct. 570, 574–76, 66 L.Ed. 975 (1922); *Oskoian v. Canuel*, 269 F.2d 311, 314 (1st Cir.1959) (applying Rhode Island law), we are constrained to acknowledge, on balance, that the available analogs have somewhat limited utility.[6] The princi-

---

**5.** The concern for notice and predictability is satisfied by the partnership agreement, a contract that puts the partners on notice that they all act on behalf of one another within the scope of their partnership activity. The UPA (which, in one form or another, has been adopted in 49 of the 50 states) also provides notice that partners are conclusively considered agents of the partnership. The concern for foreseeability is similarly satisfied; by agreeing to enter into a partnership with others, a person should reasonably foresee being haled into court in those jurisdictions in which his partners conduct activities on the partnership's behalf. The concern for reciprocity is satisfied because partners mutually benefit from each other's labors. It is, therefore befitting that they, and the partner-

ship, share the foreseeable burdens. The other Gestalt factors are likewise unoffended.

**6.** That is true of other suggested congeners as well. The district court, for instance, analogized to diversity jurisdiction, *Donatelli*, 708 F.Supp. at 37, and appellant sought to fashion a parallel from venue principles, Appellant's Brief at 22–25. We deem these comparisons to be unenlightening. On the one hand, the purposes underlying subject matter jurisdiction differ markedly from the purposes underlying personal jurisdiction. *See, e.g., Insurance Corp. of Ireland v. Compagnie des Bauxites*, 456 U.S. 694, 701–04, 102 S.Ct. 2099, 2103–05, 72 L.Ed.2d 492 (1982) (discussing distinction). On the other hand, civil venue, while more nearly compara-

pal jurisdictional lesson to be learned from comparisons, we believe, is that the seductive appeal of rigid stratification must yield to a frank appraisal of the realities surrounding any given relationship.

We conclude that, in the world of unincorporated associations, generic descriptions will not typically be dispositive as to whether the members' contacts can, for jurisdictional purposes, be visited upon the association. The entity form can be less structured than that of the corporation—or it can be hedged with formalities. The interrelationship can be at more of a remove than in a general partnership (where partners and partnership are symbiotic in virtually every sense)—or it can be much the same. Inasmuch as its format can so easily be tailored to fit the exigencies of a particular relationship, the degree and direction of influence and control between the association and the constituent members can be varied to suit. Because there is no "typical" unincorporated association, there can, jurisdictionally speaking, be no mechanical taxonomy: the very breadth of the array of associational institutions, and their diverse nature, necessitates using a functional, flexible, case-specific methodology.[7] Virtually by definition, an unincorporated association tends to be *sui generis*.

Thus, we come full circle. Being unable to employ a categorical approach to personal jurisdiction in the unincorporated associations milieu, an inquiring court must assess the nature of the legal and institutional relationships between a *particular* asso-

ciation (here, the NHL) and its constituency (here, the 21 teams); the degree of control exercised by the former over the latter; and the extent to which the latter can be said to act for and on behalf of the former. It is only in this way that we can decipher whether the league, despite its absence from Rhode Island, deliberately availed itself of the forum's benefits by reason of the activities of its member(s); and if so, whether it would be fair and just to subject the league to the forum's jurisdictional reach on that basis.

## IV

Guided by the doctrinal considerations surveyed in Part II, *supra*, and recognizing that the burden of proving jurisdiction rests with the party asserting the affirmative of the proposition, *see McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936); *Colwell Realty Investments, Inc. v. Triple T Inns of Arizona, Inc.*, 785 F.2d 1330, 1332 (5th Cir.1986) (per curiam); *Escude Cruz*, 619 F.2d at 904, we chart a course across these troubled waters.

### A

■ It seems clear that a court must first make a factual determination concerning the extent to which the unincorporated association itself does business in, or has minimum contacts with, the forum. Where, as here, those contacts fall short of the constitutionally required minimum necessary to confer jurisdiction,[8] the court

---

ble, *see, e.g., Sperry Products, Inc. v. Ass'n of American Railroads*, 132 F.2d 408, 411 (2d Cir. 1942) (dictum), *cert. denied*, 319 U.S. 744, 63 S.Ct. 1031, 87 L.Ed. 1700 (1943), is more attuned to matters of the parties' convenience than to constitutional concerns (such as state sovereignty or fundamental fairness vis-a-vis defendants).

**7.** Determining personal jurisdiction has always been more an art than a science. As Justice Marshall wrote:

Like any standard that requires a determination of 'reasonableness,' the 'minimum contacts' test of *International Shoe* is not susceptible of mechanical application; rather, the facts of each case must be weighed to determine whether the requisite 'affiliating circumstances' are present. We recognize that this

determination is one in which few answers will be written in 'black and white. The greys are dominant and even among them the shades are innumerable.'
*Kulko*, 436 U.S. at 92, 98 S.Ct. at 1697 (citations omitted).

**8.** The district court canvassed the record and found that "[t]he NHL, as an entity distinct from its members, lacks the necessary minimum contacts with Rhode Island to subject it to ... general personal jurisdiction." *Donatelli*, 708 F.Supp. at 35. Appellee disagrees. Assuming, without deciding, that this finding is currently reviewable, *but see Lane v. First National Bank*, 871 F.2d 166, 175 (1st Cir.1989) (review under 28 U.S.C. § 1292(b) should not ordinarily be expanded "beyond the borders of the question ... originally certified"), we believe the

must then ascertain whether one or more members of the association possess the requisite minimum contacts. If the answer is in the negative, the search for general jurisdiction ends. If, however, such contacts exist, the court must proceed to assess the extent of control, if any, exercised by the association over its members (and in particular, over the member whose contacts the plaintiff wishes to attribute to the association). As a subset of this inquiry, the court should assay the extent to which the member acts for, is an agent of, or is synonymous with, the association. The barometer for control, we think, is whether or not the association exercised substantial influence over the member's decision to carry on the in-forum activities which constitute the relevant "minimum contacts."

Our emphasis on control stems from a belief that the test for attribution should be a practical one. Absent a showing that the association had substantial influence over the member's decision to conduct activities in the forum, then it seems unfair to consider attributing the member's activities to the association; the "constitutional touchstone" of personal jurisdiction, after all, is whether the defendant "purposefully established 'minimum contacts' in the forum State." *Burger King*, 471 U.S. at 474, 105 S.Ct. at 2183. Unless such a showing can be made, ascribing the member's contacts to the association would be tantamount to haling the association into the forum solely as a result of attenuated third-party contacts or activities for which the association was not responsible. Personal jurisdiction cannot be hung on so fragile a hook. *See Helicopteros*, 466 U.S. at 417, 104 S.Ct. at 1873 ("unilateral activity of another party or third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum"); *see also Burger King*, 471 U.S. at 474–75, 105 S.Ct. at 2183–84; *Volkswagen*, 444 U.S. at 298, 100 S.Ct. at 567; *Hanson*, 357

U.S. at 253, 78 S.Ct. at 1239 ("the unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State"); *cf. Kulko*, 436 U.S. at 93, 98 S.Ct. at 1698 (absent parent cannot be subjected to jurisdiction of forum merely because other parent exercises child custody there pursuant to separation agreement). Because constitutional limitations upon a state's power to assert personal jurisdiction ultimately hinge upon concepts of accountability and responsibility, it would be irrational to allow courts to assert jurisdiction over an unaccountable party for the purpose of determining whether the party is indeed accountable.

 The methodology has one last step.[9] If the plaintiff cannot show that the association substantially influenced the decisionmaking leading to the member's in-forum activities, then there can be no attribution. If, however, it can be demonstrated that the association had substantial influence over such decisionmaking, the court must determine whether, given the attribution and the "minimum contacts" which travel with it, the secondary criteria (*e.g.*, notice, predictability, foreseeability, purposeful availment, reciprocity, and the other Gestalt factors) render it equitable, or inequitable, to bring the unincorporated association before the forum court. *See Burger King*, 471 U.S. at 477–78, 105 S.Ct. at 2184–85; *Volkswagen*, 444 U.S. at 292, 100 S.Ct. at 564.

### B

 Before applying this methodology to the instant case, we address plaintiff's contention that ordinary jurisdictional rules should have no bearing where professional sports leagues are involved. Such leagues are special, Donatelli says, and should be amenable to suit wherever any member

---

finding is unassailable. The lower court's factual recitation adequately mirrors the record. *See Donatelli* 708 F.Supp. at 35–36. Its legal reasoning on the point is sound. *See id.* NatServ's existence does not change the picture. As to this furculum of the case, therefore, we uphold, on the basis of the opinion below, the determi-

nation that the NHL itself has insufficient contacts with Rhode Island to confer general jurisdiction.

**9.** In this case, we need not climb this last step. *See infra* Part IV(C). We set it in place, however, in the interest of completeness.

team may be sued. But, the district court did not rely on this theorem as a ground for asserting jurisdiction; the four cases Donatelli cites fall well afield of supporting the proposition;[10] and we have been unable to unearth a single reported case which so holds. In candor, the argument is plaintiff's own invention.

Although we give the plaintiff high marks for originality, we are unimpressed with the rationale which underlies his point. Sports leagues, like other unincorporated associations, differ widely in their makeup. Generalizations are virtually meaningless. To the extent that sports leagues are similar to one another in terms of the relationship between leagues and members—and nothing in the record demonstrates any such similarities—the relevant characteristics anent jurisdiction will be those pertaining to the association's influence and control over its members. Our methodology and rule of decision, see supra Part IV(A), gives any such generic characteristics the weight they deserve—but no more. There is no logical reason why the mere label "sports league" should trigger a special set of warning bells. Nor is there any logical reason why sports leagues should be singled out from among all other unincorporated associations, and subjected to more onerous treatment, in terms of amenability to suit.

In the last analysis, we find plaintiff's argument to be little more than a makeweight. We reject the idea that, alone in the wide world of unincorporated associations, professional sports leagues are automatically to be yoked to the jurisdiction of every state where any member club may have established minimum contacts. Accordingly, we apply to the case before us the methodology limned in Part IV(A). We thus arrive at the answer to the certified question.

## C

 The NHL itself has no meaningful presence in, or contacts with, Rhode Island. *See supra* note 8. The inquiry, then, revolves around control—and we discern that the league possesses very slight influence over its member teams. Each club operates on a proprietary basis. The league does not dictate the club's entity structure or the way in which it conducts its ordinary business affairs. Each club determines its own ticket pricing structure and operating budget (including salaries, rink rental, and other major expense items). To be sure, the NHL sets the regular-season schedule and the rules for player eligibility (including the framework of the draft); and by granting franchises for specific cities the league determines the "home territory" of each club. Yet, in the overall scheme of things, the NHL's influence over individual members seems insubstantial.

Perhaps more important, none of the control which the league exerts substantially influenced the Bruins, or any other team, to maintain contacts within Rhode Island. The Bruins play only a single exhibition game in Rhode Island each year. The decision to do so is the club's; the league's scheduling powers do not extend to preseason games. The Bruins' decisions to advertise and seek ticket sales in Rhode Island are in no way mandated by the NHL. The

**10.** Two of plaintiff's cases—*Erving v. Virginia Squires Basketball Club*, 349 F.Supp. 709 (E.D.N.Y.1972) and *American Football League v. National Football League*, 27 F.R.D. 264 (D.Md. 1961)—do not concern jurisdiction over sports leagues at all, but consider only where, in terms of venue, a member club may be sued. *See Erving*, 349 F.Supp. at 712–15; *American Football*, 27 F.R.D. at 268–69. In a third case, *Hawkins v. National Basketball Ass'n*, 288 F.Supp. 614 (W.D.Pa.1968), a professional sports league was found to be doing business *for venue purposes* in a district where a member team played its "home" games under a schedule prepared by the league. *Id.* at 622. In the final case, *Beha-*

*gen v. Amateur Basketball Ass'n*, 744 F.2d 731 (10th Cir.1984), *cert. denied*, 471 U.S. 1010, 105 S.Ct. 1879, 85 L.Ed.2d 171 (1985), a divided panel of the Tenth Circuit remanded for further findings. The majority ruled that if the league was a shell, possessing no separate institutional or functional significance and "act[ing] only through [its members]," jurisdiction would attach "wherever members conduct [league] activities." *Id.* at 735. That theory is inapposite in this case because, as the district court found and the record plainly reveals, the NHL is far from a shell; it is a distinct entity with its own offices, budget, staff and the like.

existence of NatServ, and the fact that LCA—an independent entity—may distribute products in Rhode Island, add nothing consequential to the jurisdictional mix.

Nor do we believe that the telecasting of play-by-play accounts into Rhode Island makes a dispositive difference. Admittedly, the league negotiates the master contract and the teams retain the proceeds. But, in circumstances where the league itself has no "continuous and systematic general business contacts" with the forum, *Helicopteros*, 466 U.S. at 416, 104 S.Ct. at 1873, and the asserted cause of action is entirely unrelated to the telecasts, the telecasts form too slippery a foothold for personal jurisdiction over the NHL. *Accord Zimmerman v. United States Football League*, 637 F.Supp. 46, 47–48 (D.Minn. 1986); *Manton v. California Sports, Inc.*, 493 F.Supp. 496, 498–99 (N.D.Ga.1980); *Munchak Corp. v. Riko Enterprises, Inc.*, 368 F.Supp. 1366, 1374 (M.D.N.C.1973); *cf., e.g., Helicopteros*, 466 U.S. at 417–18, 104 S.Ct. at 1873–74 (regular purchases within state not sufficient to warrant assertion of general personal jurisdiction); *Glater*, 744 F.2d at 217 (regular course of advertising; dissemination of information, and solicitation of orders within state not sufficient to warrant assertion of general personal jurisdiction). On the same basis, we do not believe that the telecasts show any exertion of substantial influence by the league over the teams of a kind sufficient to justify an assertion of general personal jurisdiction.

There is little to be gained by drumming the point home. In a nutshell, the Bruins entered the Rhode Island market by their own choice and for their own benefit, not as the association's handmaiden.[11] In light of the lack of any substantial influence on the NHL's part over the Bruins' decisions, the telltales point clearly to a finding that the Bruins' contacts cannot constitutionally be imputed to the NHL. And, what scanty caselaw we, or the parties, have been able to find, suggests that this outcome is appropriate. *See, e.g., Elizabeth Hospital, Inc. v. Richardson*, 167 F.Supp. 155, 158–59 (W.D.Ark.1958) (district court · lacked

jurisdiction over American Medical Association despite jurisdiction over local medical society, an A.M.A. member), *aff'd*, 269 F.2d 167 (8th Cir.), *cert. denied*, 361 U.S. 884, 80 S.Ct. 155, 4 L.Ed.2d 120 (1959); *Szabo v. Medical Information Bureau*, 127 Cal. App.3d 51, 54–55, 179 Cal.Rptr. 368, 370–71 (1981) (state court lacked jurisdiction over nonprofit "information exchange" though numerous exchange members, all life insurers, did business in California); *Lewron Television, Inc. v. International Alliance of Theatrical Stage Employees*, 37 Md. App. 662, 666–74, 378 A.2d 728, 731–35 (1977) (similar; involving international union and local unions); *cf. Nehemiah v. Athletics Congress*, 765 F.2d 42, 48 (3d Cir. 1985) (remanding for inquiry into unincorporated association's contacts with forum despite the fact that an association member was concededly subject to forum's general personal jurisdiction).

### D

Having determined that the Bruins' Rhode Island contacts are not attributable to the NHL, we need go no further. Absent minimum contacts (direct or derivative), resort to the secondary criteria, or Gestalt factors, is unnecessary in conducting a jurisdictional search, for there can be no general jurisdiction. *See Burger King*, 471 U.S. at 477–78, 105 S.Ct. at 2184–85. We nevertheless run a representative segment of that gauntlet, as the inquiry illustrates the essential symmetry and fairness of the result which we reach:

1. Having so little control over where a given team may elect to do some business, the league has neither notice about, nor any reliable means of predicting, where it might be haled into court by reason of a member's activities.

2. There is no principled way it can plausibly be said that the NHL "purposefully availed" itself of the privileges incident to doing business in Rhode Island or that it should have foreseen being sued there in a case like this one.

3. Reciprocity is absent: the league is uninvolved in the forum and derives no

**11.** The district court concluded that, in entering Rhode Island, the Bruins were not "an agent of the association." *Donatelli*, 708 F.Supp. at 36. Appellee has not challenged that determination.

significant benefits from the Bruins' involvement.

4. Rhode Island's sovereignty is not threatened; apart from a generalized concern for the rights of its own domiciliaries, the state has no real interest in adjudicating the controversy. In point of fact, the opposite seems true: asserting jurisdiction in this case would seem to constitute a reaching-out "beyond the limits imposed" by the state's status as a "coequal sovereign[ ] in a federal system." *Volkswagen*, 444 U.S. at 292, 100 S.Ct. at 564.

5. The remaining Gestalt factors, by and large, cut in the same direction: Donatelli is capable of obtaining efficacious redress, without undue inconvenience, in, say, New York (a jurisdiction where the NHL maintains an organizational presence); other fora would seem fairer to all concerned, and more efficient; and plaintiff has adverted to no substantive social policy which would be vindicated by allowing the suit to go forward in Rhode Island.

There is no cause to paint the lily. We are fully persuaded that, on the facts of this case, the NHL cannot constitutionally be forced to defend itself in so alien a forum.

### V

■ In answer to the certified question, we hold that an unincorporated association which does not itself conduct significant activities in, or enjoy affiliating circumstances with, a state cannot be subject to the general personal jurisdiction of the state's courts on the basis of a member's contacts within the state unless the member carries on the in-forum activities under the association's substantial influence. Because such control is absent here—there is no "plus" factor beyond the Bruins' mere membership in the association—the district court's assertion of jurisdiction over the NHL was not constitutionally permissible.

*Reversed.*