## In re SAN JUAN DUPONT PLAZA HOTEL FIRE LITIGATION.

### No. MDL–721.

United States District Court, D. Puerto Rico.

Aug. 21, 1990.

See also 907 F.2d 4.

---

Plaintiffs' Steering Committee, Ana Luisa Navarro, Liaison, Hato Rey, P.R.

Carlos Padín, defendants' Liaison Counsel, Hato Rey, P.R.

## ORDER NO. 257

## IN THE MATTER OF PERSONAL JURISDICTION [1]

ACOSTA, District Judge.

At the conclusion of plaintiffs' case in chief various defendants [2] moved the Court

1. In Amended Order No. 252, filed on May 11, 1990 (docket No. 14573) the Court, in disposing of the Rule 50 motions, found that all defendants were amenable to suit in this forum and advised the parties that the pertinent findings would be issued in a separate order.

2. Sixteen (16) defendants originally raised this argument. Of these only the following remain as defendants to this litigation: ACW Airwall, Inc.; Dan River, Inc.; Foss Manufacturing Co.; Hufcor, Inc.; Hytex Industries; Insilco d/b/a Sinclair Paint Company; Piedmont Corrugated Specialty, Inc.; Santa Fe Extruders, Inc.; and Western Synthetic Felt Company. Aircoustic Wall Manufacturing Co., d/b/a ACW Airwall, Inc. though not then a party to this litigation, appeared as a "defendant" in the motion for directed verdict. Plaintiffs moved the Court to amend the complaint to add Aircoustic as a third airwall defendant, see Motion to Amend Complaint ..., filed on April 25, 1990, docket No. 14419, which motion was granted, see Court Margin Order No. 648, filed May 9, 1990. Further, Dan River, Inc. withdrew its defense of lack of in personam jurisdiction by way of an "Informative Motion" to the Court, filed on June 22, 1990 (docket No. 14987).

for a directed verdict[3] alleging they are not subject to personal jurisdiction in this forum. Defendants argue that plaintiffs failed to prove at trial the necessary facts to show that this Court is able to assert personal jurisdiction over them as indicated in Pretrial Order No. 183.[4] In turn, plaintiffs have moved the Court "to exercise nationwide personal jurisdiction" pursuant to the Multidistrict Litigation Statute, 28 U.S.C. § 1407 (1982) or in the alternative, to find that defendants have the necessary "minimum contacts" with Puerto Rico. Although the exercise of nationwide personal jurisdiction by the transferee court has been recognized as essential for "the unitary resolution of elements of complex cases" and amendments to the Multidistrict Litigation Statute have so been proposed and recommended, *see Complex Litigation Project,* 1 A.L.I Tentative Draft 188 and 66 A.L.I Proc. 389 (1989), we decline plaintiffs' suggestion that we apply this standard since we find that defendants' contacts with Puerto Rico are sufficient to subject them to the jurisdiction of this Court under both Puerto Rico law and the due process clause of the Constitution.

## I. THE LAW

### A. Burden of Proof

■ When jurisdiction is contested, the burden is on the plaintiff to prove facts necessary to sustain jurisdiction. *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Donatelli v. National Hockey League,* 893 F.2d 459, 468 (1st Cir.1990); *Escude Cruz v. Ortho Pharmaceutical Corp.,* 619 F.2d 902, 904 (1st Cir.1980). A showing of personal jurisdiction must be based on specific facts set forth in the record, and the record is to be construed in favor of the plaintiffs. *Terry L. Hopkins, Inc. v. Activation, Inc.,*

647 F.Supp. 748, 750 (D.Me.1986). Thus, the Court must make a determination of whether plaintiffs have provided affirmative proof that this forum (Court) possesses in personam jurisdiction over nonresident defendants. *Rafael Margarida & Co. v. Audi of America, Inc.,* 721 F.Supp. 394, 397 (D.P.R.1989). As further discussed below, we hereby hold that plaintiffs have met their burden.

### B. Relevant Factors

■ In determining the amenability to suit of a nonresident in a diversity action, a federal court must apply the local "long arm" provision. *Keds Corp. v. Renee Intern. Trading Corp.,* 888 F.2d 215, 218 (1st Cir.1989); *Hahn v. Vernon Law School,* 698 F.2d 48, 49–50 (1st Cir.1983). In Puerto Rico, the relevant jurisdictional statute is Rule 4.7(a) of the Puerto Rico Rules of Civil Procedure, 32 L.P.R.A. App.III, R. 4.7.[5] The rule has been interpreted by the First Circuit as extending in personam jurisdiction "to all cases where it is constitutionally permissible", *Dalmau Rodriguez v. Hughes Aircraft Co.,* 781 F.2d 9, 12 (1st Cir.1986) (citing *A.H. Thomas Co. v. Superior Court of Puerto Rico,* 98 P.R.R. 864, 870, n. 5 (1970)). *See also Benitez–Allende v. Alcan Aluminio Do Brasil, S.A.,* 857 F.2d 26 (1st Cir.1988) *rehearing denied, cert. denied* 489 U.S. 1018, 109 S.Ct. 1135, 103 L.Ed.2d 196 (1989) (Rule 4.7(a)(1) stretches "up to the point allowed by the Constitution"), citing (*Industrial Siderúrgica v. Thyssen Steel Caribbean, Inc.,* 114 D.P.R. 548, 558 (1983)).

### (1) *Due Process*

■ The due process clause of the Constitution sets limits on a court's power to assert in personam jurisdiction over non-

---

**3.** *See* Master Memorandum of Law in Support of Defendants' Motions for Directed Verdict, filed on April 16, 1990 (docket No. 14314).

**4.** In Pretrial Order No. 183, filed on May 19, 1989 (docket No. 10188) the Court denied without prejudice all motions asserting lack of in personam jurisdiction and advised that plaintiffs would have to meet this burden during trial.

**5.** Rule 4.7(a) where applicable reads as follows:

(a) Whenever the person to be served is not domiciled in Puerto Rico, the General Court of Justice shall take jurisdiction over said person if the action or claim arises because said person:
(1) Transacted business in Puerto Rico personally or through an agent.

resident defendants. The U.S. Supreme Court, in its now famous and often quoted *International Shoe Co. v. State of Washington* case, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) established that before a court can exercise this power, two conditions must be met. First, "minimum contacts" must exist between the non-resident defendant and the forum before the defendant can be subject to a judgment within the forum's territory. Second, if such contacts do exist, personal jurisdiction over the non-resident defendant must not offend "traditional notions of fair play and substantial justice." *Id.* at 316, 66 S.Ct. at 158 (*quoting Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 342–43, 85 L.Ed. 278 (1940)). To reach a determination that defendants are subject to personal jurisdiction in Puerto Rico we must, therefore, consider whether defendants purposefully availed themselves of the benefits and protections of Puerto Rico's laws and whether Puerto Rico's special interest in providing a forum for this mammoth and complex litigation will not place an "unjust or unfair" burden on these defendants.

The jurisdictional principles of *International Shoe* have undergone several changes at the hands of the Supreme Court throughout the years. In *McGee v. International Life Ins. Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957) the Court recognized "a clearly discernible" trend toward the liberalization of jurisdiction due to what it considered "the fundamental transformation of our national economy" and the substantial diminution in the burden sustained by a nonresident defendant, owing to improved transportation and communication. *Id.* at 222–23, 78 S.Ct. at 200–01. However, the "minimum contact" standard was never meant to supplant personal jurisdiction where a defendant is physically present in the forum. *See Burnham v. Superior Court of California, County of Marin,* —— U.S. ——, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990) for Justice Scalia's analysis of cases preceding and following the *International Shoe* standard.

### (2) *Purposeful Availment*

In *Hanson v. Denckla* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) the Su-

preme Court warned that the added flexibility in the minimum contacts standard did not signal an end to all restrictions on the personal jurisdiction power of state courts, and reiterated that the contacts must arise from "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Id.* at 253, 78 S.Ct. at 1240.

### (3) *Stream of Commerce Theory*

Up to this point the "purposeful availment" test had not been applied to products liability cases where nonresident manufacturers had injury-causing products entering the forum indirectly. However, in 1961 a state supreme court addressed this very issue in *Gray v. American Radiator & Standard Sanitary Corp.*, 22 Ill.2d 432, 176 N.E.2d 761 (1961). In *Gray*, where the principles of the "stream of commerce" theory first appeared, a state's assertion of jurisdiction was sustained over a manufacturer whose only apparent contact with the forum was that a single valve, manufactured and sold in another state and incorporated in a water heater in yet another state, had reached a forum consumer "in the course of commerce". *Id.* 176 N.E.2d at 764. The court reasoned that a manufacturer could reasonably be required to defend an action arising out of alleged defects in its products whenever they were used in the ordinary course of commerce. Implicit in this reasoning was the court's recognition of the trend toward expansion of jurisdiction and the shift in judicial attitudes from notions of territorial or physical power to concepts of adequate notice and the convenience of the forum, the place at which the parties could most suitably settle their disputes. Moreover, the quantum of defendant's contacts with the forum was not the sole focus of the inquiry; a single act or transaction with a substantial connection to the forum would support an assertion of jurisdiction. *Id.* at 764–65.

The importance of recognizing changing realities, both economic and commercial, led the Supreme Court to the acknowledg-

ment of the "stream of commerce" theory in *World Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). The Court addressed the personal jurisdiction issue in the context of products liability, analyzing the foreseeability of a manufacturer or distributor who delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum state. *Id.* at 297, 100 S.Ct. at 567. The Court rejected a defendant's ability to foresee injury in the forum as a basis for jurisdiction; instead, "the foreseeability ... crucial to due process analysis [was that] defendant's conduct and connection with the forum" be such that defendant should foresee being haled into court there. *Id.*

## II. MDL–721

■ The very nature of this litigation leads us to choose the stream of commerce theory as the proper focus of our analysis. The claims against defendants to this Phase II trial are essentially products liability actions involving a multitude of parties in a multidistrict/complex litigation setting. The majority of defendants are non-resident corporations, who either manufactured, distributed, sold or supplied allegedly defective products that were involved in the Dupont Plaza Hotel fire on December 31, 1986. Several of the defendants are component part manufacturers or primary raw material manufacturers or distributors whose involvement begins at the top of a complex distribution system, encompassing intervening levels of distributors, which system eventually results in multiple sales in distant forums. Thus, it appears that the most appropriate standard to apply to these defendants' claim of the lack of in personam jurisdiction is the stream of commerce approach utilized by the Supreme Court in *Woodson* and most recently discussed in *Asahi Metal Industry Co. Ltd. v. Superior Court of California*, 480 U.S. 102, 107 S.Ct. 1026, 94

L.Ed.2d 92 (1987). Both cases addressed the issue of products liability by applying stream of commerce analysis and, in *Asahi*, the more complex issue of a component part manufacturer's role in this process.[6]

In *Asahi*, the Court considered if the Constitution permitted a California court to assert jurisdiction over a Japanese firm that made valves and sold them to a tire company in Taiwan, which, in turn, inserted them into motorcycle tires sold in California. Eight justices agreed that, whether or not Asahi had minimum contacts with the forum as required by due process, California's assertion of jurisdiction would "offend traditional notions of fair play and substantial justice" and therefore denied jurisdiction. *Asahi*, 480 U.S. at 105, 107 S.Ct. at 1029. The Court based its conclusion on an assessment of five factors: the burden that defendant would face if forced to litigate in the forum; the plaintiffs' interest in obtaining effective relief; the interest of the forum state; the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several states in furthering fundamental substantive social policies. *Id.* at 113, 107 S.Ct. at 1033–34 (quoting *Woodson*, 444 U.S. at 292, 100 S.Ct. at 564–65). Furthermore, four of the eight justices found the "minimum contacts" sufficient to hold jurisdiction constitutional because while the Japanese company did not design or control the system of distribution that carried its valve assemblies into California, the company was aware of the distribution system's operation and knew that it would benefit economically from the sale in California of products incorporating its components. *Id.* 480 U.S. at 121, 107 S.Ct. at 1037–38. Thus, they stated: "[a] defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum state and indirectly benefits from the state's laws that regulate and facilitate commercial ac-

---

**6.** Yet the *Asahi* decision did not provide clear guidance to the lower courts on the assertion of personal jurisdiction based on the stream of commerce theory. For a discussion of the problems associated with the application of the stream of commerce theory after *Asahi, see* Murphy, *Personal Jurisdiction and The Stream of Commerce Theory: A Reappraisal and a Revised Approach,* 77 Ky.L.J. 243 (1988).

tivity. These benefits accrue regardless of whether that participant directly conducts business in the forum state or engages in additional conduct directed toward that state." *Id.* at 117, 107 S.Ct. at 1035 (Brennan, J., concurring in part and in the judgment). A fifth justice pointed out that resolution of the stream of commerce theory was unnecessary, given the Court's conclusion that the exercise of California's jurisdiction would be unfair, but added, however, that "[w]hether or not [a defendant's] conduct rises to the level of purposeful availment requires a constitutional determination that is affected by the volume, the value and the hazardous character of the components", *Id.* at 122, 107 S.Ct. at 1038 (Stevens, J. concurring in part and concurring in the judgment). The remaining four justices, although stating that "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum state," *Id.* at 112, 107 S.Ct. at 1033 (plurality opinion) immediately went on to find that "additional conduct" of the defendant could manifest an intent or purpose to serve the market in the forum state. The examples of such conduct cited by the justices included: advertising in the forum, designing the product for the forum market, establishing channels for the regular provision of advice to forum customers and marketing the product in the forum through a distributor-agent. *Id.*

## A. General Finding

Based on these precepts, this Court finds all defendants amenable to suit in Puerto Rico because they purposefully availed themselves of the privilege of conducting activities within this forum and, as manufacturers, component manufacturers or distributors, made deliberate efforts to serve, either directly or indirectly, a market in this forum by placing their products into the stream of commerce. So long as it was not unforeseeable to these nonresident defendants that their product would enter Puerto Rico in the normal stream of commerce, they are potentially subject to suit in this forum arising from products liability claims. *See e.g., Oswalt v. Scripto, Inc.,* 616 F.2d 191 (5th Cir.1980); *Papafagos v. Fiat Auto, S.P.A.,* 568 F.Supp. 692 (D.N.H. 1983). *See also,* Sedler, *Across State Lines; Applying the Conflict of Laws to Your Practice,* 1989 ABA Sec. Gen. Practice 142.

In addition, after careful consideration of the jurisdictional factors espoused by the Supreme Court in *Asahi,* the Court finds that under the unique circumstances and characteristics of this multiparty multidistrict case, the Court's exercise of jurisdiction over these defendants will not offend traditional notions of "fair play and substantial justice."

## B. Particular Defendants

### (1) *ACW Airwall, Inc., Aircoustics Wall Manufacturing Co. and Hufcor, Inc.*[7]

■ We deem the following facts sufficient to find that jurisdiction is permissible over these Airwall defendants.

1. Airwall directly shipped the polystyrene airwall to the Puerto Rico Sheraton Hotel.

2. Airwall drafted costs breakdowns and architectural drawings of the airwall partition which would be installed in the Sheraton Hotel in Puerto Rico.

3. Airwall advertised in its brochure the fact that the Puerto Rico Sheraton and other Puerto Rico locations (Miramar Hotel, Swiss Chalet Restaurant) had installed its pneumatic partitions.

Given the "additional conduct" factors set forth in *Asahi, supra,* we conclude that the "airwall defendants" should have known or reasonably anticipated that they would be made to answer in this forum for any alleged defects in their product. *See also Hopkins,* 647 F.Supp. at 750–51.

---

**7.** The Court is treating these three "Airwall" entities as similarly situated for purposes of the discussion on personal jurisdiction. *See* Court Margin Order 648, docket No. 14558, filed May 9, 1990; Court Margin Order 704, docket No. 15222, filed August 6, 1990 and other Orders mentioned therein.

### (2) *Hytex Industries, Inc./Foss Manufacturing Co.*

■ Hytex Industries, Inc. ("Hytex") is dedicated to the business of selling textiles to distributors. As such, it sold wallcovering to Wolf Gordon, a distributor who in turn sold the wallcovering to Madison Wholesale, the hotel's purchasing agent. Hytex directly shipped the wall carpet, marked San Juan Dupont Plaza Hotel, to Puerto Rico through Econocaribe Consolidators. Thus, although it did not sell directly to the "end user", it had knowledge of the destination of its product.

Foss Manufacturing Co. ("Foss") is similarly situated. Although it is a New Hampshire corporation with manufacturing facilities in New Hampshire and Massachusetts only, Foss manufactures needlepunched textile wallcovering in accordance with the specifications provided by Hytex in an agreement signed by both parties. Under the term of this agreement, Foss can only manufacture and sell textile wallcoverings to Hytex. The agreement also provides that Hytex has the exclusive right to market, distribute, and sell the textile wallcoverings as its own product in the United States, Canada, the Caribbean and Central America. Consequently, neither Foss nor Hytex can claim ignorance as to the destination of their product. Both could have reasonably foreseen that their product would end up in the Caribbean island of Puerto Rico and as such could anticipate that they could be the subject of a suit in this forum.

### (3) *Piedmont Corrugated Specialty, Inc. ("Piedmont")*

■ Piedmont is a North Carolina corporation with its principal place of business in Hickory, North Carolina. It is in the business of cutting and forming corrugated materials and selling cardboard cartons for the packaging of products manufactured by others. Piedmont sold corrugated carton to Drexel Heritage Furnishings, Inc. ("Drexel"), a furniture manufacturer, after cutting it and labelling it according to Drexel's specifications. Drexel then assembled the boxes and packaged the furniture that was thereafter sent to the Dupont Plaza Hotel.

Defendant alleges that the only basis upon which it is being sued is its past sales to Drexel, since it has never advertised or marketed its products directly or indirectly to Puerto Rico nor did it have prior knowledge that its products were distributed in Puerto Rico. Defendant also argues that it is not licensed to do business in Puerto Rico, nor does it have an office, agent or business operation here. Nonetheless, knowledge of the destination of its product can be imputed to Piedmont because it knew or should have reasonably known that Drexel, a renowned furniture manufacturer, would ship its product, wrapped in Piedmont corrugated material, throughout the country and to worldwide destinations. It also had knowledge that its product was used to package furniture that could be shipped by Drexel for use in hotels. Consequently, it could have foreseen that its packaging materials would end up anywhere that Drexel's international market would take them. Knowledge that this product would end up in Puerto Rico can also be imputed to Piedmont because of the widespread distribution of its products resulting from its relationship with Drexel and particularly because Drexel's purchase orders made reference to the place of destination. Further, there is no evidence that Piedmont was unaware of Drexel's sale efforts and in fact, because its product was distributed along with Drexel's product, it derived the economic benefits from Drexel's wide scope of sales efforts. Accordingly, we hold that the facts established in this case are sufficient to impose in personam jurisdiction on Piedmont.

### (4) *Western Synthetic Felt Company and Santa Fe Extruders*

■ Western Synthetic Felt Company ("WSF") manufactures and sells a Polyester Kodel wrap that is used in upholstered furniture. WSF is a division of Lightron Corp., which has its principal offices in Jericho, New York. WSF has its offices and production facilities in California. WSF allegedly sold quantities of polyester wrap to Western Bench Craft in 1986.

A polyester wrap was glued to the polyurethane foam cushions in the sofa beds manufactured by Western Bench Craft which were involved in the Dupont fire.

WSF's position is that it has not purposely availed itself of the privilege of conducting activities within this forum because a sale of a component furnishing product to either a fabricator or a furniture manufacturer in California cannot bring WSF within this forum's jurisdiction. WSF fails in its argument because it does not recognize the changing realities that have been brought to bear in this case. WSF is in court in this forum because of an alleged defect in the product it manufactured and subsequently placed in the stream of interstate commerce by way of its sale to Sealy/Western Bench Craft.[8] Sealy is a renowned furniture manufacturer whose reputable products are sold and distributed nationally and even outside the United States.[9] Defendant's knowledge of Sealy's reputation can be imputed from its commercial relationship with Sealy "for many years". Furthermore, in the case of component manufacturers, the course of dealing with the final assembler, including the length of the relationship, has been suggested as a factor to be considered in imputing knowledge of the destination of its products. *See* Case Comment, *Asahi Metal Industry Co. v. Superior Court: The Stream of Commerce Doctrine, Barely Alive But Still Kicking*, 76 Geo L.J. 203 (1987). *See also Sedler, supra.*

■ Santa Fe Extruders, Inc. ("Santa Fe") is a corporation organized under the laws of California, with its principal place of business in Santa Fe Springs, California. It manufactures poly sheet and plastic bags used for packaging. It sold polyethylene bags to Sealy Furniture Western/Western Bench Craft ("Western Bench Craft") which were used to wrap the sofa beds located in the south ballroom on the day of the fire.

■ Defendants argue that they did not have any control or knowledge of the final destination or use of the products sold to Western Bench Craft. Yet, defendants knew that Sealy/Western Bench Craft was a furniture manufacturer, and that its products would be a component part of Sealy's furniture wherever these would ultimately be sold and distributed. Where the alleged liability arises, as in this case, from the manufacture of products presumably sold in contemplation of downstream sales in other forums, it should not matter that the purchase was not made directly from the defendant manufacturer. "[F]airness requirements of due process do not extend so far as to permit a manufacturer to insulate itself from the reach of the forum's state long-arm rule by using an intermediary or by professing ignorance of the ultimate destination of its products." *DeJames v. Magnificence Carriers, Inc.*, 654 F.2d 280, 285 (3rd Cir.1981). Therefore, defendants' assertion that their products were both manufactured and sold in California to a California consumer, Madison Wholesale, will not shield them from this Court's assertion of jurisdiction, for "[if] *International Shoe* stands for anything, ... it is that a truly interstate business may not shield itself from suit by a careful but formalistic structuring of its business dealings." *Benitez–Allende*, 857 F.2d at 30 (quoting *Vencedor Manufacturing Co., Inc.*, 557 F.2d 886, 891 (1st Cir. 1977)). We therefore hold that Santa Fe Extruders and WSF are amenable to our jurisdiction in Puerto Rico.

### (5) *Insilco d/b/a Sinclair Pain Company ("Sinclair")*

■ Insilco is a Connecticut corporation with its principal place of business in Connecticut, which does business under the name of Sinclair Paint. Sinclair's principal place of business is Los Angeles, California. Sinclair is in the business of buying, marketing, and selling wallcovering materi-

---

**8.** According to Arnold Bertram's deposition Sealy Furniture Western d/b/a Landmark Fine Furniture d/b/a Sealy Fine Furniture was sold to Western Bench Craft in 1986. *See* Tr. p. 9146.

**9.** *See* Deposition of Arnold Bertram, Vice President of Operations for Sealy, read during trial on December 11, 1989.

als. It does not manufacture wallcoverings.

Prior to the fire, Sinclair sold four orders of wallcovering materials to Madison Wholesale and Hotel Systems International. Of these, two were shipped directly by Sinclair to the hotel in Puerto Rico. Sinclair alleges that because all of its marketing efforts were directed at the two purchasing entities in California (Hotel Systems International and Madison Wholesale), that it has not "purposely avail[ed] itself of the privilege of conducting activities within [Puerto Rico], thus invoking the benefits and protections of its laws." Yet, Sinclair admits that it shipped two orders of its products directly to Puerto Rico. Moreover, it knew or should have known from the reference on the purchase documents that the other two orders it received from these California entities were also destined to Puerto Rico. *See e.g., Plant Food Co-op v. Wolfkill Feed & Fertilizer*, 633 F.2d 155 (9th Cir.1980). Since Sinclair was aware of the destination of its product at the time of sale, it presumably intended it to go there. Even if it had learned of its product's destination after the fact, subsequent sales through the same channels also reveal its intent to provide products to this forum. "A [distributor] with knowledge of the destination of its products should reasonably assume that they could cause injury in the destination state. Therefore, the [distributor] is given clear notice that it should reasonably anticipate being haled into court for litigation relating to the sale of its products." *See* Case Comment, *supra* at 224–25.

## III. CONCLUSION

▉ Considered separately, all of these defendants are subject to the exercise of personal jurisdiction by this Court. As already stated, they knew or should have known that their products would reach this forum. All of the defendants are products defendants: manufacturers, component part manufacturers, or distributors, who knowingly placed their products in the stream of commerce in an effort to satisfy, serve, and further increase the market for their products. In most cases, their prod-

ucts reached Puerto Rico after traveling through complex, indirect and intervening marketing and distribution networks. By purposefully placing their products in the stream of commerce, defendants have reaped the economic benefits of selling to buyers in distant forums. Thus, they availed themselves of the benefits and privileges offered to their products by the laws of Puerto Rico and "should reasonably anticipate [the] obligations [that] accompany the harvest." *Donatelli*, 893 F.2d at 464. Having found the necessary minimum contacts between defendants we now weigh the five other factors catalogued by the Court in *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477, 105 S.Ct. 2174, 2184–85, 85 L.Ed.2d 528 (1985) in order to determine the constitutionality of this Court's exercise of jurisdiction. The five factors relevant to "fair play and substantial justice" set forth in *Burger King* and reaffirmed in *Asahi* facilitate the assertion of jurisdiction by this Court. As discussed above, these include:

1. the plaintiff's interest in obtaining convenient and effective relief;

2. the forum state's interest in adjudicating the dispute;

3. the burden on the defendant;

4. the interstate judicial system's interest in the most efficient resolution of controversies; and

5. the shared interest of the several states in furthering fundamental substantive social policies.

While in *Asahi* these factors defeated jurisdiction, they clearly favor our exercise of jurisdiction in this multi-party, multi-district complex litigation case, where the circumstances are considerably different from most two-or-three party cases that have been the subject of earlier Supreme or appellate Court decisions. A multitude of plaintiffs were injured in Puerto Rico by the allegedly defective products of the moving defendants. They all have a marked interest in obtaining relief for their injuries. Similarly, Puerto Rico has a strong interest in protecting its citizens and visitors from injuries caused by allegedly

defective products within its boundaries. The interstate judicial system's interest in resolving this controversy in the most efficient manner possible, as stressed in our Pretrial Order No. 130, compel the application of the stream of commerce rationale in a products liability case such as this. Finally, the shared interest of the several states in furthering substantive policies such as those that led to the creation of the Multidistrict Litigation Panel and rules, militate towards this Court's assertion of jurisdiction.

IT IS SO ORDERED.